Walter A. WINSHALL, in his capacity as the Stockholders' Representative, Plaintiff Below, Appellant, Cross Appellee,

v.

VIACOM INTERNATIONAL INC., and Harmonix Music Systems, Inc., Defendants Below, Appellees, Cross Appellants.

No. 39, 2013.

Supreme Court of Delaware.

Submitted: July 10, 2013.
Decided: Oct. 7, 2013.
Corrected: Oct. 8, 2013.

Gregory V. Varallo, Esquire, Scott W. Perkins, Esquire, and Robert L. Burns, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware; William B. Chandler, III, Esquire and Ian R. Liston, Esquire, Wilson Sonsini Goodrich & Rosati, Georgetown, Delaware; Of Counsel: Shawn J. Rabin, Esquire (argued) and Neal S. Manne, Esquire, Susman Godfrey LLP, New York, New York; and David M. Schiffman, Esquire (argued), Linton J. Childs, Esquire, Sidley Austin LLP, Chicago, Illinois, for Appellant, Cross Appellee.

Stephen P. Lamb, Esquire, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Wilmington, Delaware; Of Counsel: Leslie G. Fagen, Esquire, Daniel J. Leffell, Esquire, Robert A. Atkins, Esquire (argued), and Steven C. Herzog, Esquire, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York, for Appellees, Cross Appellants.

Before STEELE, Chief Justice, BERGER, JACOBS, and, RIDGELY, Justices, and VAUGHN, President Judge,* constituting the Court en Banc.

JACOBS, Justice:

Pending before us are cross-appeals from a judgment of the Court of Chancery in an action brought by Walter A. Winshall ("Winshall"), as representative of the former stockholders (the "Selling Shareholders") of Harmonix Music Systems, Inc. ("Harmonix"). The dispute arose out of a merger in 2006 (the "Merger"), wherein Harmonix was acquired by Viacom International, Inc. ("Viacom"). For the reasons stated in its opinions issued on November 10, 2011 [1] and December 12, 2012,[2] the Court of Chancery: (1) dismissed Winshall's complaint against Viacom and Harmonix for failure to state a legally cognizable claim for relief, (2) declared that Viacom was not entitled to indemnification from the Selling Shareholders for alleged breaches of representations and warranties contained in the Merger Agreement, and (3) ordered payment of the escrowed portion of the Merger cash consideration owed by Viacom to the Selling Shareholders.

Winshall appealed to this Court from the portion of the final judgment dismissing Count I of his complaint. Viacom cross-appealed from that portion of the judgment relating to Counts II and III of the complaint, in which the court determined that Viacom was not entitled to indemnification and directed that the escrowed funds be paid to the Selling Shareholders. For the reasons next discussed, we affirm the judgment of the Court of Chancery in its entirety.

## FACTS

The facts are drawn from the amended complaint, as recited by the Court of Chancery in its two opinions. Viacom is a global entertainment company whose portfolio of television, motion picture and digital media brands includes MTV, BET Networks and Paramount Pictures. Har-

---

* Sitting by designation pursuant to art. IV, § 12 of the Delaware Constitution and Supreme Court Rules 2 and 4(a) to constitute the quorum as required.

1. *Winshall v. Viacom Int'l., Inc.* (*Winshall Op.*), 55 A.3d 629 (Del.Ch.2011).

2. *Winshall v. Viacom, Int'l, Inc.* (*Winshall Supp. Op.*), 2012 WL 6200271 (Del.Ch. Dec. 12, 2012).

monix is a developer of music-oriented video games, including *Guitar Hero* and *Rock Band.*[3]

In 2006, Viacom acquired Harmonix in the Merger in which Harmonix became a wholly owned subsidiary of Viacom. The critical terms of that transaction were embodied in a merger agreement dated September 20, 2006 ("Merger Agreement") and in an escrow agreement dated October 27, 2006 ("Escrow Agreement"). Plaintiff Winshall was the designated representative of the Selling Shareholders, who are the former holders of Harmonix stock, options and warrants.

Under the Merger Agreement, Viacom agreed to pay the Selling Shareholders two forms of consideration: (1) a $175 million cash payment payable at closing, plus (2) a contingent right to receive incremental uncapped earn-out payments, based on Harmonix's financial performance, during the two years after the Merger, *i.e.,* 2007 and 2008. Those contingent payments were equal to 3.5 times the amount by which Harmonix's Gross Profit (as defined by the Merger Agreement)[4] exceeded $32 million in 2007 and $45 million in 2008. The Merger Agreement did not require Viacom or Harmonix[5] to conduct their businesses, postmerger, so as to ensure or maximize the earn-out payments.

The Merger Agreement and Escrow Agreement also provided that the Selling Shareholders shall indemnify and reimburse Viacom for certain losses, including the costs of defending against third-party claims arising out of a breach of representations and warranties in the Merger Agreement. Those agreements further provided that, for a period of 18 months, $12 million of the initial $175 million payment would be held in escrow and made available to satisfy those indemnification obligations. The Selling Shareholders were obligated, however, to indemnify Viacom against any covered liabilities above the escrowed $12 million, from the monies otherwise payable under the earn-out provisions.

By the time the Merger closed in October 2006, Harmonix was engaged in developing a new video game, *Rock Band.* Six months later, in March 2007 and before the development of *Rock Band* was complete, Harmonix entered into an agreement (the "Original EA Agreement") with Electronic Arts, Inc. ("EA") to distribute *Rock Band* in exchange for the payment to EA of distribution fees (the "distribution fee"). The distribution fee to EA turned out to be an important component of the Merger Agreement formula for calculating the earn-out payments to the Selling Shareholders, because it was one of the largest single postmerger expenses that Harmonix incurred. The amended complaint alleges that the huge and immediate success of *Rock Band* threatened to cause a surge in the 2008 earn-out payment which, in turn, gave the Defendants bargaining leverage to renegotiate the Original EA Agreement.

In October 2008, EA and Harmonix entered into an amended licensing agreement

---

**3.** Both Viacom and Harmonix are Delaware corporations.

**4.** Under the Merger Agreement, Gross Profit was defined as the sum of "Product Gross Profit" for all of Harmonix's products, Product Gross Profit being the difference between (i) the "Net Revenue" attributable to the product and (ii) the sum of all "Direct Variable Costs" attributable to the product. Direct

Variable Costs consist of, among other things, "distribution fees" and "royalties payable to third parties." *Winshall Op.,* 55 A.3d at 632.

**5.** Except where the context otherwise requires, the combined post-merger entity, (Viacom and Harmonix), are referred to collectively in this opinion as either "Viacom" or "Defendants."

(the "Amended EA Agreement") that extended the term of the Original EA Agreement, and also expanded EA's right to distribute additional games, such as *The Beatles: Rock Band,* that were not covered by the Original EA Agreement.[6] During the negotiations, (the amended complaint alleges) EA offered to reduce the 2008 distribution fees payable by Harmonix (now a Viacom subsidiary) in exchange for receiving other, separate benefits. Ultimately, the Defendants did not accept that proposal. Instead, the Amended EA Agreement left the 2008 distribution fee level unchanged, and reduced the distribution fees for years beginning in 2009, in return for (among other things) commitments by EA to purchase advertising from MTV Networks and other Viacom outlets. The Amended EA Agreement also accelerated into 2008 certain payments due to Harmonix from EA that would otherwise have been paid in January and February 2009. Importantly, none of those amendments affected in any way the Selling Shareholders' earn-out payment for 2008: the amount of that payment remained exactly what it would have been under the Original EA Agreement.

During 2007 and 2008, four claims for violation of intellectual property rights were asserted, post-merger, by third parties against Harmonix. Those claims led to a demand by Viacom, communicated to Winshall as the Selling Shareholders' representative, for indemnification under the Merger Agreement. In the Merger Agreement, Harmonix had represented that (i) there were no outstanding intellectual property violation claims against Harmonix of which Viacom was not aware, and that (ii) no activity, business operation, or Current Game of Harmonix constituted a violation.[7] On April 24, 2008, three days before the deadline for giving notice of claims under the Merger Agreement, Viacom informed Winshall of three third-party claims that had been asserted against Viacom for violation of intellectual property rights, and advising that Viacom might seek indemnification for losses for alleged breaches of representations and warranties in the Merger Agreement.[8] On July 21, 2008, almost three months after the deadline for notifying Winshall of certain indemnity claims had elapsed, Viacom gave Winshall notice of a fourth claim—a patent infringement complaint by Konami Digital Entertainment Co. Ultimately, all four claims were disposed of, either by settlement or by court dismissal.

In September 2008, four months after the contractual escrow period had ended, Winshall, on behalf of the Selling Shareholders, demanded the release of the escrowed funds. Viacom refused to consent, citing the alleged breaches of representations and warranties in the Merger Agreement. In December 2010, Winshall filed a complaint in the Delaware Court of Chancery against Viacom and Harmonix. That complaint was amended March 28, 2011, and ultimately embodied three Counts.

Count I alleges that in renegotiating the EA Agreement, Viacom and Harmonix

---

**6.** That game was referred to in the Amended EA Agreement as "Project 9."

**7.** The latter representation, memorialized in § 4.15(*o* ) of the Merger Agreement, explicitly excluded patents. Rather, Harmonix represented that it had no knowledge of any patent infringement.

**8.** In the first claim against Viacom, Activision, which had certain rights to music video

games that Harmonix had previously developed (the *Guitar Hero* series), alleged that in *Rock Band,* Harmonix had infringed copyrights and trademarks that Activision owned. In the second claim, 1st Media LLC, a patent assignee, alleged that Harmonix, in *Rock Band,* had infringed a patent held by 1st Media. In the third claim, Gibson Guitar Corp., a maker of musical instruments, alleged that in *Rock Band,* Harmonix had infringed a patent that Gibson held.

breached their implied obligation of good faith and fair dealing under the Merger Agreement, by intentionally not taking advantage of their opportunity to negotiate lower distribution fees to EA for 2008. By not using that leverage, Winshall avers, Viacom and Harmonix intentionally manipulated and reduced the amount of the 2008 earn-out payment that the Selling Shareholders would otherwise have received. Viacom and Harmonix moved to dismiss Count I under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief could be granted. In an opinion issued on November 10, 2011, the Court of Chancery granted that motion.[9]

Thereafter, the parties litigated Counts II and III of Winshall's amended complaint. Those Counts embodied disputes arising out of Viacom's claims against the Selling Shareholders for indemnification under the Merger Agreement, and out of Viacom's refusal to release the moneys held in escrow.[10] Winshall moved for summary judgment on Counts II and III. By opinion dated December 12, 2012, the Court of Chancery granted that motion,[11] and in its final judgment, the court declared that Viacom was not entitled to indemnification and ordered the release of the escrowed funds.

Winshall appealed to this Court from that portion of the judgment dismissing Count I of the amended complaint. Viacom and Harmonix cross-appealed from those portions of the order awarding summary judgment to Winshall on Counts II and III. For the reasons that follow, we uphold the judgment in its entirety.

## THE CONTENTIONS, THE ISSUES AND THE STANDARDS OF REVIEW

### A. Winshall's Appeal

On his appeal, Winshall claims that the Court of Chancery reversibly erred by dismissing his complaint, because (he urges) the complaint alleges a cognizable claim for breach of the implied covenant of good faith and fair dealing. Winshall advances that position on two separate grounds. First, he contends that the amended complaint properly alleges that the Selling Shareholders had a reasonable expectation—and the Merger Agreement imposed an implied obligation—that Viacom would not manipulate Harmonix's cost structure so as to reduce the 2008 earn-out payment to the Selling Shareholders. Second, by not using its bargaining power to decrease the 2008 distribution fee to EA when negotiating the Amended EA Agreement, and instead by shifting the expense decrease into later years, Viacom acted in bad faith and breached that implied obligation. Viacom vigorously opposes these claims.

The issue presented on Winshall's appeal is whether, with all reasonable inferences drawn in favor of the plaintiff, the amended complaint alleges a reasonably conceivable set of facts under which the plaintiff would be entitled to relief. More specifically, the issue is whether the plaintiff adequately pled an implied contractual obligation that the Defendants breached. Our review of a decision dismissing a complaint for failure to state a claim is *de novo*.[12]

9. *Winshall Op.*, 55 A.3d 629.

10. Count II sought declaratory relief that Viacom was not entitled to indemnification. Count III sought an order requiring Viacom to release the escrowed funds to the Selling Shareholders.

11. *Winshall Supp. Op.*, 2012 WL 6200271. The court also determined (in the alternative) that the Konami patent claim was time-barred.

12. *Central Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 536–37 (Del.2011). Although this standard of

## B. *Viacom's Cross Appeal*

On its cross appeal, Viacom claims that the Court of Chancery reversibly erred in granting summary judgment to Winshall. Specifically, Viacom argues that: (i) the Merger Agreement imposed an independent duty on the Selling Shareholders, separate and apart from the obligation to indemnify, to pay Viacom's costs of defending the third-party claims; and (ii) Winshall was obligated to indemnify Viacom for any losses resulting from those claims, which constituted breaches of Merger Agreement Sections 4.15(k) and 4.15(*o*)(i).

review was uncontested, the trial court, in a lengthy footnote (*see Winshall Op.*, 55 A.3d at 636 n. 23) critiqued the standard of review that this Court reaffirmed in *Central Mortgage,* an unrelated case. In *Central Mortgage* we held that the Court of Chancery in several prior decisions (including *Central Mortgage* ), had applied an incorrect standard on a motion to dismiss a complaint under Court of Chancery Rule 12(b)(6)—specifically, the federal pleading standard announced in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). In those cases, the United States Supreme Court held that to survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955).

The *Twombly/Iqbal* plausibility standard is more rigorous than Delaware's counterpart pleading standard. Long standing Delaware case law holds that a complaint will survive a motion to dismiss if it states a cognizable claim under any "reasonably conceivable" set of circumstances inferable from the alleged facts. These two standards are significantly different. *See* Jayne S. Ressler, *Plausibly Pleading Personal Jurisdiction*, 82 Temp. L.Rev. 627, 632 (2009) ("Twombly is premised on the notion that the specificity of allegations contained in pleadings can be plotted on a spectrum with 'conceivable' on one end ... and 'plausible' on the other end, as the most restrictive."); *accord, Central Mortgage*, 27 A.3d at 537 n. 13 ("Our governing 'conceivability' standard is more akin to 'possibility,' while the federal 'plausibility' standard falls somewhere beyond mere 'possibility' but short of 'probability.' "). In *Central Mortgage* we concluded that, "until this Court decides otherwise or a change is duly effected through the Civil Rules process, the governing pleading standard in Delaware to survive a motion

to dismiss is reasonable 'conceivability.' " *Id.* at 537.

The trial court, in its footnote, appears to regard *Central Mortgage* not as a definitive final adjudication (which it was), but as another round of a continuing debate that the trial court is free to prolong in a later opinion. Thus, the trial court suggests there is little difference between the Delaware conceivability standard and the federal plausibility standard, given the line of Delaware authority that holds that under the conceivability standard a court need not accept conclusory allegations unsupported by specific pled facts. The court had previously cited *Twombly* (the footnote adds) "only to note that the federal courts seemed to be moving to a pleading standard more consistent with Delaware's approach." Indeed (the trial court volunteers), "[t]o this mind, if something is conceivable, it is plausible. If something is implausible, it is inconceivable."

The trial court's opinion was not the appropriate medium to reargue this issue. Procedurally, no party contested the applicability of the traditional reasonable conceivability standard. *Crescent/Mach I Partners, L.P. v. Dr Pepper Bottling Co. of Tex.*, 962 A.2d 205, 208 (Del.2008) ("Delaware law requires that a justiciable controversy exist before a court can adjudicate properly a dispute brought before it."). And substantively, the court's statement of personal belief ("[t]o this mind, if something is conceivable, it is plausible") overlooks the fact that a majority of the Justices of the United States Supreme Court—who authored *Twombly* and *Iqbal*—had concluded the contrary. We recognize that, at some future point in time, the plausibility standard may be shown as the better rule for Delaware. But, and to reiterate our holding in *Central Mortgage*, until this Court is persuaded of that in a fully litigated case, or until the current standard is changed by an appropriate procedural rule amendment, reasonable conceivability is the Rule 12(b)(6) pleading standard in Delaware.

The Court of Chancery (Viacom claims) erred in concluding otherwise, and by ordering the return of the escrowed funds. Winshall vigorously opposes these claims.

 On review of a grant of summary judgment, the inquiry is whether there is any genuine issue of material fact, and if not, whether the moving party is entitled to judgment as a matter of law.[13] That is the broad issue posed by Viacom's cross appeal from the grant of summary judgment, which we review *de novo*.[14]

### ANALYSIS

#### I. Winshall's Appeal From The Dismissal Of Count I

##### A. The Court Of Chancery Properly Concluded That The Amended Complaint Did Not State A Valid Claim For Breach Of The Implied Covenant Of Good Faith And Fair Dealing.

 Winshall's claim on its direct appeal, in essence, is that Viacom and Harmonix had the market power to renegotiate the Original EA Agreement and that, because an opportunity to increase the amount of the 2008 earn-out payment was presented, Harmonix had an obligation, implied under the Merger Agreement, to take that opportunity. The Court of Chancery rejected that claim as a matter of law. We hold that the Court of Chan-

---

**13.** DEL. CT. CH. R. 56; *see GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.,* 36 A.3d 776, 789 (Del.2012). The cross appeal was properly taken by Viacom, because it asks us to overturn a portion of the judgment for which Viacom otherwise seeks affirmance. That said, we take this occasion to correct a potential misimpression relating to the standard for taking a cross-appeal, created by our recent decision in *Gerber v. Enterprise Products Holdings, LLC,* 67 A.3d 400 (Del.2013). In *Gerber,* the Court of Chancery dismissed all claims asserted against the general partner of a limited partnership, and the remaining co-defendants. On appeal to this Court, the defendants-appellees urged affirmance of the entire judgment. The appellees argued, nonetheless, that the Court of Chancery had erred in determining that the complaint stated a legally cognizable claim that the defendants-appellees had breached the implied covenant of good faith and fair dealing. This Court declined to address that specific argument, because the "[d]efendants [had] not cross-appealed from this Court of Chancery determination, which therefore stands as the law of the case." *Id.* at 424 (footnote omitted).

Although that ruling did not affect the outcome of the *Gerber* appeal, it could be read as requiring that, to challenge an adverse subsidiary ruling by the trial court, an appellee must cross appeal from that ruling, even though the appellee ultimately prevailed. To the extent that *Gerber* lends itself to that reading, it conflicts with our prior case law and is incorrect. In *In re Santa Fe Pac. Corp. Shareholder Litig.,* 669 A.2d 59, 67 (Del.1995), we rejected a similar argument advanced by the plaintiffs-appellants, that the successful defendant-appellee should have filed a cross-appeal. We noted that the "[p]laintiffs' argument fails to consider ... that [the defendant] could hardly appeal the dismissal of all claims against it. [The defendant] is not challenging the judgment below or seeking to enlarge its legal rights." And, in *Haley v. Town of Dewey Beach,* 672 A.2d 55, 58–59 (Del.1996), we noted that "[a]n appellee who does not file a cross-appeal, however, may defend the judgment with any argument that is supported by the record, even if it questions the trial court's reasoning or relies upon a precedent overlooked or disregarded by the trial court." Insofar as *Gerber* suggests that all aspects of a trial judge's reasoning are unalterable unless the victorious appellee files a cross appeal, it is erroneous and we overrule it. The proper standard, which we reaffirm, is as set forth in *Santa Fe* and *Haley.*

**14.** *Riverbend Cmty., LLC v. Green Stone Eng'g, LLC,* 55 A.3d 330, 334 (Del.2012).

cery ruled correctly that no such obligation can be implied under the Viacom–Harmonix Merger Agreement.

The implied covenant of good faith and fair dealing cannot properly be applied to give the plaintiffs contractual protections that "they failed to secure for themselves at the bargaining table." [15] As the Court of Chancery found:

> [T]he implied covenant is not a license to rewrite contractual language just because the plaintiff failed to negotiate for protections that, in hindsight, would have made the contract a better deal. Rather, a party may only invoke the protections of the covenant when it is clear from the underlying contract that "the contracting parties would have agreed to proscribe the act later complained of ... had they thought to negotiate with respect to that matter." [16]

Given the limited scope and function of the implied covenant, Winshall's claim fails as a matter of law. First, it is not "clear from the underlying [Merger Agreement]" that the parties would have agreed to proscribe Viacom and Harmonix from agreeing to the Amended EA Agreement fee structure, had they thought to negotiate with respect to that issue. Indeed, the Merger Agreement and the Original and Amended EA Agreements—the latter having been adopted over two years *after* the Merger—compel the opposite conclusion. The Amended EA Agreement did not diminish or in any way affect the amount of the earn-out payment for 2008. For Winshall's implied covenant claim to succeed, it must be clear from the Merger Agreement that Viacom and Harmonix would have agreed to take whatever steps were available and required to maximize the amount of the earn-out. The parties to the Merg-

er Agreement could have created such an obligation in their contract, but they did not. Nothing in the Merger Agreement states, or could be read to imply, that Viacom or Harmonix must conduct their businesses, post-merger, so as to maximize the amount of the Selling Shareholders' earn-out payments.

Second, although Viacom and Harmonix did not accept EA's offer to reduce the 2008 distribution fees, neither did they take any action to increase the 2008 fees beyond what was expected under the Original EA Agreement. That fact also defeats the implied covenant claim, as the Court of Chancery recognized:

> [T]here is a critical difference between Viacom and Harmonix's actions here and the actions of an acquirer who promises earn-out payments to the sellers of the target business and then purposefully pushes revenues out of the earn-out period. It is true that when a contract confers discretion on one party, the implied covenant of good faith and fair dealing requires that the discretion— such as Viacom's discretion in controlling Harmonix after the Merger and during the earn-out period—be used reasonably and in good faith. Thus ... if Viacom and Harmonix had agreed to pay double EA's ask in distribution fees in 2008 in return for paying no distribution fees in 2009, such an agreement would arguably be a breach of the implied covenant. In that case, Viacom and Harmonix would be depriving the Selling Stockholders of their reasonable expectations under the Merger Agreement by actively shifting costs into the earn-out period that had no place there.... Winshall would have me hold that [Viacom's] discretion over the Har-

15. *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1260 (Del.2004).

16. *Winshall Op.*, 55 A.3d at 637 (footnote omitted) (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del.2005)).

monix business ... was subject to an implied covenant of good faith that encompassed not only a duty not to harm the Harmonix business so as to reduce Gross Profit for purposes of calculating the earn-outs, but also to do everything it could to increase the earn-out payments. As Viacom and Harmonix point out, "on [Winshall's] logic, Defendants would have been obligated to negotiate the distribution fees down to zero for 2008 to maximize the impact on the [earn out payment for 2008] and make up the shortfall with higher payments thereafter—a commercially absurd outcome." This is not a tenable application of the limited implied covenant of good faith and fair dealing.[17]

Equally without merit is Winshall's argument that the Selling Shareholders had a "reasonable expectation" that Viacom and Harmonix would conduct themselves, post-merger, to maximize the 2008 earn-out, and that by not doing so the Defendants deprived the Selling Shareholders of the benefit of their bargain. As the Court of Chancery found, there was no such bargain or expectation:[18]

> Here ... the Selling Stockholders had no legitimate expectation that, if Harmonix was offered a chance to renegotiate the amount of distribution fees payable under a distribution agreement that was entered into *after* the Merger, the terms of which are *not* challenged as unfair, it would choose a structure that benefited the Selling Stockholders and increased the amount of already unlimited earn-out payments that it was obligated to make under the Merger Agreement.... [I]t is not alleged that Viacom and Harmonix intentionally pushed revenue out

of the earn-out period ... in exchange for reduced costs in some future period.[19]

Winshall's claim rests upon a fundamental misconception of the limited scope and function of the implied covenant of good faith and fair dealing in Delaware contract jurisprudence. That claim therefore fails as a matter of law.

## B. Winshall's Claims Of Error Lack Merit.

On appeal, Winshall advances three specific challenges, one procedural and two factual, to the effect that the Court of Chancery's analysis is legally incorrect. First, Winshall claims, the Court of Chancery erroneously relied on the Original EA Agreement, which was not submitted until the Defendants filed their reply brief. Second, the court failed to recognize that EA needed to reach a new agreement to distribute *Rock Band 2* in 2008, and therefore was required to grant Harmonix concessions based on increased royalty costs. And third, EA's distribution rights under the Original EA Agreement were at significant risk, because the parties had failed to agree on key terms. We conclude that none of these arguments has merit.

Winshall first argues that the Court of Chancery erred in relying upon, or even considering, the Original EA Agreement—which was extrinsic to the pleadings and submitted only in connection with Defendants' reply brief—when deciding the motion to dismiss. The reason, Winshall asserts, is that the Original EA Agreement was not integral to Winshall's implied covenant claim or incorporated by reference into the amended complaint.

---

17. *Winshall Op.,* 55 A.3d at 638 (footnotes omitted).

18. *Id.* at 639 ("the facts do not support an inference that Viacom and Harmonix acted to deprive the Selling Stockholders of their reasonably expected benefits under the Merger Agreement....")

19. *Id.* at 639–40 (emphasis in original).

The short answer is that the Original EA Agreement *was* integral to Winshall's claim and *was* incorporated by reference into the amended complaint. The Original EA Agreement was essential to Winshall's claim because had the Defendants not entered into that Agreement, Winshall would not be able to contend that, in agreeing to amend the Original EA Agreement, the Defendants breached an implied covenant under the Merger Agreement. And, the Original EA Agreement was incorporated by reference into the amended complaint, which contains at least nine explicit references to that agreement and/or its terms, in seven paragraphs within that pleading. "[A] plaintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms."[20] Winshall's attempt to have it both ways does not withstand scrutiny.

Winshall next argues, as a factual matter, that EA needed to reach a new agreement to distribute *Rock Band 2* in 2008, and that to achieve that goal, EA was required to grant Harmonix concessions based on increased royalty costs. Therefore, "[t]he Court of Chancery was ... wrong when it concluded that '[i]t is undisputed that EA had rights to the *Rock Band* products that entered the market during the earn-out period—*Rock Band* and its sequel *Rock Band 2*.' "[21]

This argument also misses the mark. Preliminarily, Winshall makes no effort to explain how this factual argument, even if correct, is legally relevant to the Court of Chancery's analysis or result. The court's factual inference that Winshall disputes—

that EA had rights to the *Rock Band* products that entered the market during the earn-out period—was the predicate for the court's legal conclusion that "these were the games in which the Selling Stockholders clearly had an expectancy interest. But that interest only extended to the sales of these games in 2007 and 2008, not to sales made in later periods."[22] Although it is not altogether clear, it appears that Winshall is arguing that the Selling Shareholders also had an expectancy interest in sales made in the post-earn-out periods.

If that is Winshall's claim, it fails because he has not shown why its rejection by the Court of Chancery is legally erroneous. On that issue the court held that:

Nothing in the Amended Complaint rationally supports an inference that Harmonix could have pulled the plug on the Original EA Agreement in 2008, before the end of the earn-out period. EA would not offer concessions in return for any 2008 *Rock Band* products, because it already had the contractual rights to *Rock Band* and *Rock Band 2*, which were the *Rock Band* games released during that year. I can only infer that EA was trying to button up its rights to future products in future periods—products ... released after the expiration of the earn-out period and in which the Selling Stockholders had no reasonable expectancy interest.[23]

Lastly, Winshall argues that EA's distribution rights under the Original EA Agreement were at risk, because the parties had failed to agree on key terms in

20. *Fletcher Int'l, Ltd. v. ION Geophysical Corp.*, 2011 WL 1167088, at *3 n. 17 (Del.Ch. Mar. 29, 2011); *see also Midland Food Servs., LLC v. Castle Hill Holdings V, LLC*, 792 A.2d 920, 925 n. 5 (Del.Ch.1999) (citing *In re Santa Fe Pac. Corp. Shareholder Litig.*, 669 A.2d 59, 69 (Del.1995)).

21. Appellant's Op. Br. at 30 (quoting *Winshall Op.*, 55 A.3d at 640).

22. *Winshall Op.*, 55 A.3d at 640 (footnote omitted).

23. *Id.* at 640–41.

that agreement. Again, the legal relevance of this diffusely presented argument is not clear. If its purpose is to show that Viacom and Harmonix had the negotiating leverage to bargain for reduced distribution fees in 2008, that is of no significance, because even if true, the Defendants had no implied covenant-based duty to minimize the 2008 distribution fees. Moreover, the Court of Chancery found, that argument was never fairly made or presented in the amended complaint or in Winshall's brief opposing Viacom's motion to dismiss and, therefore, was waived.

We conclude, for these reasons, that the Court of Chancery committed no legal error in dismissing Count I of the amended complaint.

## II. Cross Appeal From The Grant Of Summary Judgment To Winshall

Viacom has cross appealed from the grant of summary judgment against Viacom and for Winshall on Counts II and III. In the Court of Chancery, Viacom contended that: (a) it (Viacom) was entitled to indemnification for breaches of representations and warranties made by Harmonix's Selling Shareholders in the Merger Agreement, and was also entitled to retain the $12 million of funds escrowed to secure that obligation; and (b) even if there was no breach of the representations and warranties, the Selling Shareholders were independently obligated to cover Viacom's costs of defending the third-party intellectual property claims.

The Court of Chancery rejected Viacom's claims on three separate grounds. First, because the third-party claims alleged infringement after the deal had closed, those claims were not covered by the Merger Agreement's representations and warranties, which operated only as of the time Viacom acquired Harmonix's business. Second, for a right to indemnification to arise there must be a breach of those representations and warranties, and Viacom failed to demonstrate any such breach. Third, absent a breach, the Selling Shareholders had no independent contractual duty to pay Viacom's defense costs.[24]

On its cross-appeal, Viacom claims that these rulings all constituted reversible error. As earlier noted, we review a trial court decision granting summary judgment *de novo*. The test is "whether, viewing the facts in the light most favorable to the nonmoving party, the moving party has demonstrated that there are no material issues of fact in dispute and that the moving party is entitled to judgment as a matter of law."[25] We conclude that the Court of Chancery correctly ruled that Viacom failed to satisfy these criteria.

### A. Absent A Breach Of Contractual Representations And Warranties, The Merger Agreement Does Not Impose An Independent Duty To Pay Defense Costs.

■ The plain language of the Merger Agreement conditions indemnification upon the existence of a breach of a representation or warranty in that Agreement. Section 8.2(a) of the Merger Agreement relevantly provides:

(a) Subject to the limitations set forth in this Article VIII, each [Selling Share-

---

24. *Winshall Supp. Op.*, 2012 WL 6200271, at *1. The court also held, in the alternative, that the indemnification request made by Viacom arising out of the Konami claim in July 2008 was time barred. *Id.* Because we uphold the grant of summary judgment on the basis that no underlying contractual obligation was triggered or breached, we do not reach this alternative holding.

25. *Riverbend Cmty., LLC v. Green Stone Eng'g, LLC*, 55 A.3d 330, 334 (Del.2012) (quoting *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del.2012)).

holder] agrees ... to ... indemnify Parent [Viacom], the Surviving Corporation [Harmonix] and their respective Affiliates ... (each a "Parent/MergerCo Indemnified Party") against and hold them harmless from and against any and all Losses, which may be sustained or suffered by any such Parent/MergerCo Indemnified Parties based upon, arising out of or by reason of:

(i) the breach of any representation or warranty of the Company contained in this Agreement. . . .

Defendants claim that the Merger Agreement imposes an "independent duty to pay defense costs" that is separate from and "broader than the duty to indemnify." [26] Rejecting this claim, the Court of Chancery reasoned:

If the Sellers were ... to be responsible for paying for the defense of Viacom against any claim that involved an arguable breach of representations and warranties, regardless of whether a breach ... was ultimately proven, we should expect to find the relevant contractual provision stating this in as many words. [27]

Yet the Court of Chancery was unable to locate any such provision in the Merger Agreement, and neither can we. Where parties to a merger agreement intend to create separate duties to indemnify and to defend, they employ an "indemnify and defend against claims" clause or similar language to that effect. [28] But where, as here, the contract expressly imposes only a duty to "indemnify," as opposed to "indemnify and defend," the courts generally hold that there is no duty to defend. For example, in *Lear Corp. v. Johnson Elec. Holdings Ltd.*, a federal district court held that a stock purchase agreement with an "indemnify and hold harmless" clause only defined duties to indemnify, and imposed no duty to defend. [29] In its affirming opinion, the Seventh Circuit explained that "no duty to defend means no duty to pay for the outlays of defense on a current basis. Payment abides the decision about indemnity." [30] Similarly, in *Moriarty v. Hills Funeral Home, Ltd.*, the court held that under an asset purchase agreement with an "indemnify against breaches" clause, the seller had no obligation to pay defense costs unless the buy-

**26.** Appellees' Ans. Br. at 35–36.

**27.** *Winshall Supp. Op.*, 2012 WL 6200271, at *5.

**28.** *See LaPoint v. AmerisourceBergen Corp.*, 970 A.2d 185, 190 (Del.2009) (merger agreement required buyer to "indemnify, defend and hold harmless"); *see also Convergent Wealth Advisors LLC v. Lydian Holding Co.*, 2012 WL 2148221, at *1 (S.D.N.Y. June 13, 2012) (stock purchase agreement required sellers to "indemnify, defend, and hold [the Buyer] harmless ... from ... all Losses . . . . based on events occurring prior to closing"); *Molex Inc. v. Wyler*, 334 F.Supp.2d 1083, 1085 (N.D.Ill.2004) (stock purchase agreement required seller to "indemnify and defend [purchaser] for any loss or expenses relating to any claim made by persons not disclosed"). Insurance policies typically include separate coverage of defense costs, even for claims that are "groundless" or

"false." *See, e.g., United Westlabs, Inc. v. Greenwich Ins. Co.*, 2011 WL 2623932, at *3 (Del.Super.Ct. June 13, 2011) (requiring insurer to defend "even if any of the allegations of the Claim are groundless, false or fraudulent"), *aff'd*, 38 A.3d 1255 (Del.2012) (TABLE); *DynCorp v. Certain Underwriters at Lloyd's, London*, 2009 WL 3764971, at *4 (Del.Super.Ct. Nov. 9, 2009) (policy requiring insurer to defend claims "even if groundless, false, [or] fraudulent"); *see also, Pac. Ins. Co. v. Liberty Mut. Ins. Co.*, 956 A.2d 1246, 1250 (Del.2008) (providing that insurer has a "duty to defend any 'suit' ").

**29.** *Lear Corp. v. Johnson Elec. Holdings Ltd.*, 2003 WL 21254253, at *8 (N.D.Ill. May 30, 2003), *aff'd*, 353 F.3d 580 (7th Cir.2003).

**30.** *Lear Corp. v. Johnson Elec. Holdings Ltd.*, 353 F.3d 580, 584 (7th Cir.2003).

er demonstrated that the seller breached a representation or warranty.[31]

For these reasons, we suspect, the Defendants do not ground their position on the Merger Agreement's substantive indemnification provision (§ 8.2(a)). Rather, they rely on its procedural provision, (§ 8.2(d)(i)), which states:

> Parent shall give the Stockholders' Representative written notice of any claim, suit, investigation, action, assertion, event or proceeding by or in respect of a third party as to which a Parent/MergerCo Indemnified Party may request indemnification pursuant to Section 8.2(a).... Parent shall have the right to direct ... the defense or settlement of any such claim at the expense of the applicable indemnifying parties.

The Defendants argue that under the quoted provision, the mere act of providing notice of a third-party claim entitles them to recover their costs of defense, regardless of whether they are entitled to indemnification. The reason (Defendants argue) is that § 8.2(d)(i) uses "present-tense language," even though the validity of the claim (and, consequently, the right to indemnification) may not be determined until the claim is later resolved. As Defendants express the argument, they "may request indemnification" even where they are not entitled to it, and the making of the request creates an "obligation to pay defense costs [that] is separate from the obligation to indemnify."[32] The Court of Chancery concluded that this interpretation of the Merger Agreement "contradicts its plain text and evident logic."[33] We agree.

The plain meaning of the text of § 8.2(d) is that the obligation to pay defense costs depends on the existence of a duty to indemnify under § 8.2(a). The first sentence of § 8.2(d)(i) specifically addresses claims for which Defendants "may request indemnification pursuant to Section 8.2(a)...." The last sentence states that "the defense or settlement of any such claim [is] at the expense of the applicable indemnifying parties." The Selling Shareholders, however, are not "applicable indemnifying parties" unless they have a duty to indemnify. Nor are the Defendants helped by § 8.2(d)(ii), which, as the Court of Chancery explained, "follows on directly from § 8.2(d)(i), and discusses only the treatment of 'such claim[s]' as are mentioned in § 8.2(d)(i)—*i.e.*, claims made 'pursuant to Section 8.2(a) ...' which for the purposes of this motion involve a breach of a representation or warranty."[34]

If the obligation to pay defense costs were not restricted to indemnified claims, no contractual limit would exist on the lawsuits potentially subject to this obligation. As the Court of Chancery observed, under the Defendants' interpretation, all they need do is send a notice, and the Selling Shareholders "could thus be on the hook for defending against frivolous claims that had nothing at all to do with the state of Harmonix when they sold it to Viacom."[35] The Defendants suggest any notice would be limited to those claims that allege wrongdoing covered by the Merger Agreement's representations and warranties. But no such limitation is found in the contract. If the parties intended to require the Selling Shareholders

31. *Moriarty v. Hills Funeral Home, Ltd.*, 221 F.Supp.2d 887, 896–98 (N.D.Ill.2002).

32. Appellees' Ans. Br. at 2.

33. *Winshall Supp. Op.*, 2012 WL 6200271, at *5.

34. *Id.*

35. *Id.*

to reimburse the Defendants for the costs of defending every infringement claim regardless of its merit, they could have used appropriate language to accomplish that result.[36]

Finally, the Defendants' interpretation of § 8.2(d)(i) improperly conflates the legally distinct concepts of advancement and indemnification. Under Delaware law, an "indemnify and hold harmless" clause does not confer a right of advancement, *i.e.,* the right to payment of "litigation expenses as they are incurred regardless of whether [the party] will ultimately be entitled to indemnification."[37] The Merger Agreement does not provide that right. Under that Agreement the effect of a notice is simply to freeze the funds held in escrow, not to entitle the Defendants to draw on the escrow to pay their ongoing litigation expenses. That the Defendants never attempted to do that further supports the Court of Chancery's interpretation of the Merger (and Escrow) Agreements.

For these reasons, the Court of Chancery correctly concluded that the Merger Agreement did not impose any independent duty to pay defense costs, in the absence of a breach of an underlying representation or warranty.[38]

*B. The Defendants Have Not Established Any Breach Of A Representation Or Warranty In The Merger Agreement.*

■ The Defendants' second claim on their cross-appeal is that, even if they had no independent right to recover defense costs, they established indemnifiable breaches of the Merger Agreement and that the Court of Chancery erred in holding otherwise. As earlier noted, three companies brought lawsuits against Viacom and Harmonix, claiming that the manufacture and sale of *Rock Band* infringed their patents, and a fourth company filed a lawsuit alleging copyright and trademark infringement. In defending those lawsuits, the Defendants denied any infringement, and won or settled all of the cases. Before the Court of Chancery, however, the Defendants argued that those third-party claims constituted breaches of representations and warranties in the Merger Agreement. The Court of Chancery disagreed, holding that the Defendants had failed to establish a breach of any representations or warranties in the Merger Agreement.

The Defendants rely upon two provisions of the Merger Agreement, one found in § 4.15(*o* )(i), and the other, in § 4.15(k), to support their challenge of the Court of Chancery's determination. Section 4.15(*o* )(i), which does not apply to patents, represented that:

> Except as set forth on Schedule 4.15(*o* ), (i) neither the operation of the Business, nor any activity of the Company, nor any manufacture, use, importation, offer for sale and/or sale of any Current Game in accordance with the terms of the applicable Publishing Agreement infringes on, constitutes a misappropria-

---

**36.** See authorities cited at note 26, *supra.*

**37.** *Majkowski v. Am. Imaging Mgmt. Servs., LLC,* 913 A.2d 572, 586 (Del.Ch.2006) ("Delaware law has traditionally recognized that indemnification and advancement are two distinct and different legal rights.").

**38.** As an alternative argument, the Defendants suggest that the case should be remanded because the Merger Agreement is "at the very least ambiguous." Even if that were so, it would not support a remand, because Defendants never offered any extrinsic evidence before the Court of Chancery to support its interpretation. *See Intel Corp. v. Am. Guar. & Liab. Ins. Co.,* 51 A.3d 442, 451 (Del.2012) ("Intel chose not to introduce any extrinsic evidence in the proceedings below.... We will not remand the matter to allow Intel to now do so.")

tion of (or in the past constituted a misappropriation of), or violates (or in the past infringed on or violated) any intellectual property rights of a third party except for the rights of any person or entity under (A) any Mark under any Law other than U.S. federal or U.S. state Law or (B) any Patent. . . .

The second provision upon which Defendants rely, § 4.15(k), applies to "Company Developed Software." Section 4.15(k) pertinently represented:

Except as set forth on Schedule 4.15(k), with respect to (i) the Company Developed Software, and (ii) Software licensed to the Company by a third party, in either case, used in Games in development or in Current Games (in accordance with the terms of the applicable Publishing Agreement), the Company (A) has adequate rights therein as is necessary for the current use (if any) of such Company Developed Software and Software by the Company, or (B) had adequate rights therein as was necessary to license, transfer, convey and/or assign copyright ownership in Company Developed Software to Publishers as required under the terms of the Publishing Agreement.

The Defendants contended before the Court of Chancery—as they do before us on appeal—that the above-quoted representations must be interpreted to cover *Rock Band*, which was part of the "Business," and was an "activity" of Harmonix under § 4.15(*o* )(i), and was "Company Developed Software" used in a "Game[ ] in development" under § 4.15(k). Defendants also claim that, to be entitled to indemnification, they do not need to prove that *Rock Band* infringed any third-party intellectual property. The Court of Chancery rejected the Defendants' interpretation of § 4.15(k), reasoning that:

This provision cannot apply to any alleged violations of intellectual property rights in *Rock Band,* because it covers the "current use" of the intellectual property, which must refer to the use of the intellectual property in October 2006, when Viacom purchased Harmonix. The claims for which Viacom seeks indemnification all relate to the final *Rock Band* video game that was produced in November 2007. What Viacom was doing with *Rock Band* over a year after the merger closed cannot be considered "current use." This conclusion ∴ is supported by the use of the present tense, in "*has* adequate rights." This must refer to the use to which Harmonix was putting the *Rock Band* prototype in October 2006, not any future use. . . . There is no reason why the Sellers would have indemnified Viacom for infringements of intellectual property rights arising out of Harmonix's actions at a time when the Sellers no longer controlled Harmonix, and Viacom has not pointed to any case law that can support such an expansive interpretation of the indemnification provisions. I therefore find, as a matter of law, that there has been no breach of the representations in § 4.15(k).[39]

And, the court rejected the Defendants' interpretation of § 4.15(*o* )(i), because:

Viacom does not claim that *Rock Band* is a "Current Game." Instead, Viacom claims that Harmonix's development of *Rock Band* is included within "the operation of the Business, [ ] or any activity of the Company," and that any claims arising out of the development of *Rock Band* thus fall within the scope of the representation and warranty. This argument does not persuade me. First, it is clear that the representation only covers the present time, not the future.

39. *Winshall Supp. Op.,* 2012 WL 6200271, at *6 (italics in original, footnotes omitted).

The term "Business," as in "operation of the Business," is defined in the Merger Agreement as "the business of the Company as *currently conducted.*" ... [T]his must refer to October 2006, and not November 2007. All Viacom can rely on, then, is its claim that the alleged violations of intellectual property rights claimed by [the third-party claimants] relate to an "activity of the Company." But, the claims brought by the third parties as to which Viacom seeks indemnification related to the content of ... *Rock Band* ... as published and sold to the public in November 2007, and not to Harmonix's activities before this time. Therefore, there is no claim that Harmonix's "activit[ies]" in 2006 were in breach of a representation or warranty.... [A]s I have noted, there is no reason why the Sellers might have indemnified Viacom against losses arising out of infringements of intellectual property rights that took place at the time of *Rock Band's* publication in 2007, when the Sellers no longer controlled Harmonix.[40]

Defendants claim that these rulings are erroneous, because they rest on a "textually unhinged" distinction between "future" games and "current" games. In fact, Defendants argue, at the time the Merger closed *Rock Band* was indisputably a game "in development." Moreover (they urge), all of the third-party claims alleged infringement of the then "current" use of "Company Developed Software" in a "Game[ ] in development"—namely, the software used in *Rock Band.*

These arguments fail on several grounds. First, the Defendants never alleged, let alone presented evidence, that *Rock Band* infringed any third-party intellectual property rights. Defendants' response is that they did not need to establish infringement to be entitled to the escrowed funds. But that response rests upon the now-discredited premise that the mere giving of notice of a third-party claim "triggered a duty, on the part of Plaintiff and his constituents, to pay those defense costs."[41] That flaw alone is dispositive.

Second, Defendants do not point to anything in the Merger Agreement clearly establishing that the Selling Shareholders intended to make legally binding representations or warranties about a future *Rock Band* game that would not be completed, manufactured and or sold until after Viacom acquired ownership of Harmonix. So unusual and counter-intuitive would be a representation or warranty of that kind, that its expression in a contract would need to be clear and unambiguous. No such clear, unambiguous expression can be found in the Merger Agreement.[42]

Lastly, the Defendants do not support with evidence any of the constituent building blocks required to support the arguments that they construct. In their brief, Defendants argue that to the extent "Harmonix was allegedly infringing upon third-party intellectual property rights, that infringement started at the moment it began employing the intellectual property at issue in its development of *Rock Band* ...."[43] But, Defendants presented no evidence that Harmonix ever "employed the intellectual property at issue," let alone that it began doing so before Viacom

---

40. *Id.* at *6–7 (italics in original, footnotes omitted).

41. Appellees' Reply Br. on Cross–Appeal at 13.

42. The Defendants do not claim that the Merger Agreement is even ambiguous in that regard, nor could they; because "[u]nder Delaware law, indemnity provisions are to be construed strictly rather than expansively." *Winshall Supp. Op.,* 2012 WL 6200271, at *6 n. 53, and authorities cited therein.

43. Appellees' Ans. Br. at 45.

bought the company. Nor is there record evidence from which a trier of fact could find that any component of the *Rock Band* software had been "developed" when Viacom acquired Harmonix. Defendants have not identified any previously "developed" software that was being used in developing *Rock Band* at the time that Viacom bought the company.

We conclude that the Court of Chancery committed no error, and ruled correctly, in granting summary judgment to Winshall on Counts II and III of the amended complaint.

### CONCLUSION

For the above reasons, the judgment of the Court of Chancery is AFFIRMED.

