IN THE SUPREME COURT OF NORTH CAROLINA

No. 100A22

Filed 1 September 2023

VALUE HEALTH SOLUTIONS, INC. and NAGARAJAN NEIL PARTHASARATHY

v.

PHARMACEUTICAL RESEARCH ASSOCIATES, INC. and PRA HEALTH SCIENCES, INC.

Appeal pursuant to N.C.G.S. § 7A-27(a) from an order entered on 13 December 2019, an order and opinion entered on 4 February 2020, an order and opinion entered on 22 May 2020, and an order and opinion entered on 6 April 2021, by Judge Gregory P. McGuire, Special Superior Court Judge for Complex Business Cases, in Superior Court, Wake County, after the case was designated a mandatory complex business case by the Chief Justice pursuant to N.C.G.S. § 7A-45.4(b). Heard in the Supreme Court on 15 March 2023.

*Guidry Law Firm PLLC, by David G. Guidry, for plaintiff-appellants.*

*Barnes and Thornburg LLP, by John M. Moye, Allen R. Baum, and Mitchell Osterday, for defendant-appellees.*

BARRINGER, Justice.

## I.    Factual Background

Pharmaceutical Research Associates, Inc. and PRA Health Sciences, Inc. (collectively defendants, will be referred to as PRA in the singular), together form a

large contract research organization, providing clinical trial services to pharmaceutical and biotechnology companies around the world. Value Health Solutions, Inc. (VHS) is a software company, founded by plaintiff Neil Parthasarathy. VHS developed three software applications for use in the clinical trial process: ClinTrial Max (CTMax), Cloud Max, and Info Max (collectively, the Solutions). The Solutions were compatible with a platform called Salesforce, which is widely used by organizations involved in clinical trials. The Solutions caught the interest of PRA.

## A. PRA's Evaluation of VHS's Software Capabilities

PRA approached Parthasarathy in early 2014, expressing interest in acquiring the Solutions. A year-long negotiation process and due diligence period ensued, during which PRA had full access to the Solutions. PRA tested the Solutions to determine what enhancements would be necessary if PRA were to acquire it. PRA identified several functional deficiencies in the software and prepared a list of enhancements PRA would require to "close the gap" between the Solutions and the software PRA was using at that time. PRA advised Parthasarathy of these functional deficiencies.

## B. PRA's Letter of Intent

PRA's Executive Vice President and Chief Financial Officer, Linda Baddour, sent Parthasarathy a "Non-Binding Letter of Intent" (LOI) on 15 October 2014. The LOI outlined PRA's proposal to acquire VHS. The LOI included, among other things, that PRA would make the following payments: (1) a one time, up-front payment to

VHS and Parthasarathy of between one and three million dollars; (2) incentive payments of $333,000.00, with each conditioned upon the completion of one of three "Integration Milestones" within eighteen months of PRA acquiring VHS; and (3) future incentive payments to VHS and Parthasarathy, conditioned upon the completion of certain "Performance Milestones" as related to external sales of licenses of VHS's software.

As summarized by the trial court, the LOI proposed the following structure for the Performance Milestones:

i.      a payment of $2.5 million for reaching $25 million in annual sales within two years of closing;

ii.      a payment of $5 million for reaching $50 million in annual sales within three years of closing;

iii.      a payment of $7.5 million for reaching $75 million in annual sales within four years of the closing; and

iv.      payment of a one percent (1%) annual royalty on sales for an additional four years after the $75 million sales amount is reached.

The LOI also stated that it

> constitutes a statement of the intentions of the parties with respect to a potential Transaction, and does not contain all matters upon which agreement must be reached in order for a definitive agreement to be finalized or for the transaction to be consummated. Except for sections 3 through 8 of [the] LOI, which shall be legally binding in accordance with their respective terms, neither this LOI nor the acceptance thereof is intended to, nor shall it, create a binding legal obligation, or any obligation by any of the parties hereto to enter into any transaction, negotiate or take any other action in contemplation thereof, or [execute] any definitive agreements. The parties further acknowledge and agree that, except as otherwise provided in the immediately preceding sentence, none of this LOI,

any proposal made . . . , nor the current on-going discussions between the parties are intended to (and shall not) create a legally binding obligation or commitment on the part of any party with respect to the negotiation or completion of the Transaction.

## C. The Asset Purchase Agreement

On 21 May 2015, plaintiffs and defendants entered into an Asset Purchase Agreement (APA), governed by Delaware law. Under the terms of the APA, the Solutions would be sold to PRA, by plaintiffs, in exchanged for PRA stock and $2.5 million. The APA further provided for "contingent payments" if certain milestones were achieved.

The first group of contingent payments was outlined in Article 2.6(a)(i), (ii), and (iii) of the APA. The first group of contingent payments pertained to the following: integration of the VHS software into PRA's clinical trial system; completion of product enhancements coinciding with functional deficiencies identified during PRA's due diligence efforts; and completion of the migration of PRA clinical trial studies into VHS software (collectively, the Development Milestones).

The second group of contingent payments was outlined in the APA in sections 2.6(a)(iv), (v), (vi), and (vii). The second group of contingent payments pertained to the external sales of licenses to the Solutions within four years of the APA closing (the Sales Milestones).

Article 2.6 of the APA provides:

> Milestones. As additional consideration for the transactions contemplated hereby, and subject to the terms

of this Section 2.6, Purchaser shall make (or [PRA] shall make on Purchaser's behalf) the following payments (each, a "Contingent Payment"):

i. upon completion of the integration of the parties' Salesforce™ environments set forth on Schedule 2.6(a)(i), [PRA] shall issue to Seller (or as otherwise directed by Seller's Representative), within thirty (30) days after such completion, that number of shares of PRA Common Stock equal in value to Three Hundred Thirty-Three Thousand U.S. Dollars ($333,000.00), based on the Fair Market Value as of the date of issuance of such shares; provided, however, that completion occurs within the first consecutive eighteen (18) months from the Effective Time (the "Integration Period");

ii. upon completion of the key product enhancements set forth on Schedule 2.6(a)(ii), [PRA] shall issue to Seller (or as otherwise directed by Seller's Representative), within thirty (30) days after such completion, that number of shares of PRA Common Stock equal in value to Three Hundred Thirty-Three Thousand U.S. Dollars ($333,000.00), based on the Fair Market Value as of the date of issuance of such shares; provided, however, that completion occurs within the Integration Period;

iii. upon completion of the migration of the clinical trial management systems studies of Purchaser and its Affiliates into [CTMax] as set forth on Schedule 2.6(a)(iii), [PRA] shall issue to Seller (or as otherwise directed by Seller's Representative), within thirty (30) days after such completion, that number of shares of PRA Common Stock equal in value to Three Hundred Thirty-Three Thousand U.S. Dollars ($333,000.00), based on the Fair Market Value as of the date of issuance of such shares; provided, however, that completion occurs within the Integration Period;

iv. upon the achievement of aggregate External Sales

Value Health Sols., Inc. v. Pharm. Rsch. Assocs., Inc.

*Opinion of the Court*

equal to Twenty[-]Five Million U.S. Dollars ($25,000,000), Purchaser shall make, within thirty (30) days following the date on which [PRA] files its next quarterly report with the United States Securities and Exchange Commission (the "SEC") after such achievement, a cash payment of Two Million Five Hundred Thousand U.S. Dollars ($2,500,000.00) to Seller (or as otherwise directed by Seller's Representative) (the "First Milestone Payment"); provided, however, that such achievement occurs prior to the second (2nd) anniversary of the Closing Date (the "First Milestone period");

v. upon the achievement of aggregate External Sales equal to Fifty Million U.S. Dollars ($50,000,000.00), Purchaser shall make, within thirty (30) days following the date on which [PRA] files its next quarterly report with the SEC after achievement, a cash payment of Five Million U.S. Dollars ($5,000,000.00) to Seller (or as otherwise directed by Seller's Representative) (the "Second Milestone Payment"); provided, however, that such achievement occurs prior to the third (3rd) anniversary of the Closing Date (the "Second Milestone Period");

vi. upon the achievement of aggregate External Sales equal to Seventy[-]Five Million U.S. Dollars ($75,000,000.00), Purchaser shall make, within thirty (30) days following the date on which [PRA] files its next quarterly report with the SEC after achievement, a cash payment of Seven Million Five Hundred Thousand U.S. Dollars ($7,500,000.00) to Seller (or as otherwise directed by Seller's Representative) (the "Third Milestone Payment"); provided, however, that such achievement occurs prior to the fourth (4th) anniversary of the Closing Date (the "Third Milestone Period"); and

vii. for four (4) consecutive calendar years following the achievement of aggregate External Sales equal to

Seventy-Five Million U.S. Dollars ($75,000,000.00) (the "Major Milestone", and the date on which the Major Milestone is achieved, the "Major Milestone Date"), Purchaser shall make, within thirty (30) days following the date on which [PRA] files its next quarterly report with the SEC after each of the four (4) anniversaries of the Major Milestone Date, a per annum royalty payment to Seller (or as otherwise directed by Seller's Representative) equal to one percent (1%) of the aggregate amount of External Sales made during the applicable calendar year (such payments, the "Royalty Payments"). For the avoidance of doubt, any such Royalty Payments shall be made regardless of whether the First Milestone Payment, the Second Milestone Payment and/or the Third Milestone Payment have previously been made.

The APA defines "External Sale" as "the sale of one or more licenses to the Solutions by [PRA] or one of its Affiliates to a third party which is not (i) an Affiliate of [PRA] or (ii) using such license(s) in connection with providing services to [PRA] and/or any of its Affiliates."

The APA further provides for the independence of the contingent payments in Section 2.6(b), titled "Independence of Contingent Payments":

> [PRA]'s obligation to pay the Contingent Payments to [VHS] (or as otherwise directed by [VHS's] Representative) in accordance with Section 2.6(a) is an independent obligation of [PRA] and is not otherwise conditioned or contingent upon the satisfaction of any conditions precedent to any preceding or subsequent Contingent Payment and the obligation to pay a Contingent Payment to [VHS] shall not obligate [PRA] to pay any preceding or subsequent Contingent Payment. For the avoidance of doubt and by way of example, if the conditions precedent to the payment of the First Milestone Payment for the First Milestone Period are not satisfied, but the conditions

precedent to the payment of the Second Milestone Payment for the Second Milestone Period are satisfied, then [PRA] would be obligated to pay such Second Milestone Payment for the Second Milestone Period for which the corresponding conditions precedent have been satisfied, and not the First Milestone Payment for the First Milestone Period.

## D. The Takeda Master Services Agreement

On 31 August 2016, PRA entered into a Master Services Agreement (MSA) with Takeda Pharmaceuticals (Takeda). Under the MSA, PRA was to provide services to Takeda through use of PRA's "Owned Technology." Section 7.02(b) of the MSA is entitled "License to [PRA] Owned Technology During the Term." This section of the MSA reads as follows:

> Section 7.02(b) <u>License to [PRA] Owned Technology During the Term</u>. As of the Commencement Date and for the remainder of the Term, [PRA] hereby grants Takeda, Takeda Affiliates and their respective Personnel and third party service providers the right to access and use [PRA] Owned Technology used in supporting or providing the Services for purposes of receipt and use of the Services in the conduct of Takeda's and Takeda's Affiliates' business. For the avoidance of doubt, the foregoing right is granted under all [PRA] Owned IP and includes the right to use all configuration capabilities offered by the [PRA] Owned Technology.

The MSA defines PRA Owned Technology as follows:

> "[PRA] Owned Technology" means (i) all confidential or proprietary processes, procedures, methodologies, standard operating procedures, software, templates, programs[,] and other protectable materials that are used generally by [PRA] in [PRA]'s business[;] . . . (ii) derivative works [of item (i)] . . . ; and (iii) any form of delivery for (i) and (ii) received as part of the services, such as via Cloud

Computing.

The MSA includes "software as a service" within cloud computing. PRA's Rule 30(b)(6) witness regarding the MSA, Brian Haas, testified that "software as a service means that the client does not have to own the technology . . . [to] utilize [it]," but instead, "through licensing," the client can be "provided with access to that output or that use of the software."

The Solutions is among the software PRA agreed to utilize in order to provide services to Takeda. PRA currently uses updated versions of VHS's software to manage "approximately three to four" projects for Takeda under the MSA. PRA has earned approximately $491 million under the MSA.

### E. Discussions of Amending the APA Milestones

In December 2016, Parthasarathy and Colin Shannon, Chief Executive Officer of PRA, met to discuss amending the APA to provide new deadlines by which to achieve the milestones. Shannon requested that Deborah Jones-Hertzog, PRA's Senior Vice President of IT, work with Chuck Munn, PRA's in-house counsel, to develop a new framework for the milestone deadlines. A draft was proposed and circulated amongst Jones-Hartzog, Munn, and Mike Irene, PRA's Executive Director of IT. The draft was never presented to Parthasarathy.

Plaintiffs alleged before the trial court that PRA "falsely promis[ed] to amend the APA and extend the milestone deadlines" and "made representations to . . . Parthasarathy that induced him to believe that PRA intended to amend the payment

milestone timelines." Specifically, those representations include an email from Shannon to Parthasarathy stating that PRA was "obviously trying to get [VHS and/or Parthasarathy] a contract" regarding the milestones. The representations also include a communication from Jones-Hertzog to Parthasarathy stating that she had an updated milestone timeline for which she was awaiting approval.

In July 2017, Parthasarathy submitted his own proposed amendments to the Development Milestones and proposed resolutions of the Sales Milestones. In his proposal, Parthasarathy asserted the following: that milestone (i) had been completed and should be paid "as soon as possible"; and that milestones (ii) and (iii) "need[ed] to be rewritten" or, alternatively, PRA needed to identify what additional work was needed from Parthasarathy so that those milestones could be completed and paid no later than January 2018. Parthasarathy's proposal also acknowledged that milestone (iv), the first Sales Milestone, had not been achieved. No agreement was reached regarding amending the milestones.

**F. Parthasarathy's Employment Agreement with PRA**

As part of the acquisition plan regarding the Solutions, PRA hired Parthasarathy as the Vice President of Technology. His employment agreement stated that Parthasarathy would have the "status and responsibilities as determined from time to time" by PRA's "CEO or the CEO's designee." The employment agreement also required Parthasarathy to dedicate his full-time attention, skills, and energy to his role with PRA. PRA contends that, in 2017, Parthasarathy "checked

out" of his role with PRA, started a business with his own employees, would attend meetings but make no contribution, and stopped replying to emails.

## II.    Procedural History

Plaintiffs filed the Complaint in this matter on 5 October 2018. On 26 March 2019, defendants filed the Amended Answer, Affirmative Defenses, and Counterclaims. On 4 September 2019, plaintiffs moved to amend the Complaint.

On 5 September 2019, Plaintiffs submitted Plaintiffs' Rule 10.9 Summary of Discovery Dispute (the Third Discovery Dispute) by email. The trial court determined that the Third Discovery Dispute was not sufficiently ripe. The discovery dispute sought determination as to whether documents requested were necessary to determine whether defendants had violated the External Sales provisions of the APA.

On 1 November 2019, the trial court granted leave for plaintiffs to file an Amended Complaint. The Amended Complaint asserted claims for breach of contract, intentional misrepresentation, negligent misrepresentation, fraudulent inducement, violation of North Carolina's Unfair and Deceptive Trade Practices Act (UDTPA), promissory estoppel, and unjust enrichment. Plaintiffs renewed their Rule 10.9 discovery dispute on 25 November 2019, via email, to the court. A discovery teleconference was held on 9 December 2019. On 2 December 2019, defendants filed an answer to plaintiffs' amended complaint, and a motion to dismiss all of plaintiffs' claims except for the breach of contract claim. On 13 December 2019 the trial court entered its order denying plaintiffs' Rule 10.9 discovery request without prejudice to

the trial court issuing a later order following disposition of summary judgment motions. On 17 December 2019, defendants voluntarily dismissed one of two remaining counterclaims, to which plaintiffs filed a reply on 30 December 2019.

Plaintiffs filed a Motion for Leave to File Second Amended Complaint on 23 January 2020. On 4 February 2020, the trial court denied plaintiffs' motion to amend the Complaint for a second time. On 22 May 2020, the trial court entered its Order and Opinion on Defendants' Motion to Dismiss Amended Complaint. The trial court dismissed plaintiffs' claims for negligent misrepresentation and fraudulent inducement "to the extent" the claims were based on pre-APA misrepresentations. Claims based on misrepresentations and statements made in the pre-APA LOI, and post-APA were not dismissed. The trial court granted defendants' motions to dismiss as related to the negligent misrepresentation, promissory estoppel, and unjust enrichment claims.[1] The trial court denied the motion to dismiss as related to the UDTPA claim.

Plaintiffs and defendants filed cross motions for summary judgment, filing briefs in support on 11 August 2020 and 12 June 2020, respectively. Plaintiffs sought summary judgment on the final remaining counterclaim. Additionally, as directed by the trial court in the Rule 10.9 discovery dispute conference and order, Plaintiff moved for summary judgment as to whether the Takeda MSA qualified as an

---

[1] Plaintiffs have not appealed the trial court's order granting defendants' Motion to Dismiss the claims of promissory estoppel and unjust enrichment. Accordingly, those issues are not before us and will not be discussed further in this opinion.

"External Sale" under the APA. Defendants' motion sought summary judgment on plaintiffs' four remaining claims—breach of contract, intentional misrepresentation, fraudulent inducement, and violation of the UDTPA.

On 6 April 2021, the trial court entered its Order and Opinion granting summary judgment for defendants on all of plaintiffs' remaining claims. The order denied summary judgment to plaintiffs on defendants' final counterclaim for breach of contract against Parthasarathy and on the issue of whether the Takeda MSA constituted an "External Sale."

Defendants stipulated to the dismissal of the final counterclaim on 8 October 2021. Plaintiffs filed notice of appeal on 22 October 2021.

### III. Motion to Dismiss

### A. Standard of Review

Dismissal of a claim under Rule 12(b)(6) is subject to de novo review. *Bridges v. Parrish*, 366 N.C. 539, 541 (2013). A dismissal is warranted "when: '(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim.' " *Krawiec v. Manly*, 370 N.C. 602, 606 (2018) (quoting *Wood v. Guilford Cnty.*, 355 N.C. 161, 166 (2002)). In evaluating a party's complaint, this Court will "take the allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *New Hanover Cnty. Bd. of Educ. v. Stein*, 380 N.C. 94, 106–07

(2022).

## B. Fraud by Omission and Promissory Fraud

The trial court correctly dismissed plaintiffs' purported claims of fraud by omission and promissory fraud pursuant to North Carolina Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted for failing to satisfy the requirements found in Rule 9(b). Plaintiffs did not plead fraud by omission or promissory fraud in their Amended Complaint. Instead, the Amended Complaint raised claims of intentional misrepresentation, negligent misrepresentation, and fraudulent inducement. A complaint that fails to allege a legal theory that is later briefed does not meet Rule (9)(b)'s pleading requirement. *See Terry v. Terry*, 302 N.C. 77, 85 (1981).

Moreover, plaintiffs did not satisfy the particularity requirement of Rule 9(b) as interpreted by this Court. N.C.G.S. § 1A-1, Rule 9(b) (2021). "[I]n pleading actual fraud[,] the particularity requirement is met by alleging time, place and content of the fraudulent representation, identity of the person making the representation and what was obtained as a result of the fraudulent acts or representations. *Terry*, 302 N.C. at 85; N.C.G.S. § 1A-1, Rule 9(b) ("In all averments of fraud, duress or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.") An alleged misrepresentation must be "definite and specific." *Ragsdale v. Kennedy*, 286 N.C. 130, 139 (1974).

## C. Fraud and Fraudulent Inducement

We agree with the trial court and affirm the order dismissing the claims of fraud and fraudulent inducement based on pre-APA representations not involving the LOI. A successful fraud claim requires a plaintiff prove: "(1) representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Id.* at 138. The elements for showing fraudulent inducement are identical. *Ward v. Fogel*, 237 N.C. App. 570, 581 (2014), *disc. rev. denied*, 368 N.C. 249 (2015) (mem.).

The trial court divided plaintiffs' fraud-related claims into two categories: claims based on alleged misrepresentations occurring prior to execution of the APA; and claims based on alleged misrepresentations that occurred after execution of the APA. The trial court granted defendants' 12(b)(6) Motion to Dismiss plaintiffs' claims for intentional misrepresentation and fraudulent inducement for pre-APA representations claims not involving the LOI on the grounds that the claims were not pled with sufficient particularity to satisfy Rule 9(b) requirements.[2] Claims related to post-APA representations and those related to the LOI remained.

Here, the Amended Complaint is devoid of any facts that identify who specifically made statements to plaintiff Parthasarathy. Nor does the Amended

---

[2] Section IV. C. of this opinion affirms the trial court's summary judgment order dismissing plaintiffs' claims of intentional misrepresentation and fraudulent inducement in the LOI.

Complaint specify exactly when the statements were made, or where. The Amended Complaint only made broad allegations stating that PRA knowingly made false representations. The closest allegation to providing particularity states that "[d]uring a yearlong due diligence period and negotiations, PRA represented to [plaintiff Parthasarathy] that in addition to using [the Solutions] to provide services to PRA's customers, PRA also would sell or license [the Solutions] to other PRA customers, and, with few exceptions to any customers VHS had developed relationships with prior to the acquisition." This allegation falls short of the particularity requirement of Rule 9(b).

The Amended Complaint is absent of facts sufficient to meet the heightened standard specifying the time, place, and content of the misrepresentation, nor does it identify who made the misrepresentation. *Terry*, 302 N.C. at 85. Accordingly, the trial court was correct in dismissing the claims for fraud and fraudulent inducement based on PRA's alleged pre-APA representations.

## D. Negligent Misrepresentation

The trial court granted defendants' 12(b)(6) Motion to Dismiss plaintiffs' claim for negligent misrepresentation based on insufficient pleading. We agree with the trial court and affirm the trial court's order dismissing plaintiffs' negligent misrepresentation claim.

The North Carolina Business Court and North Carolina's federal district courts have consistently held that complaints alleging negligent misrepresentation

must plead such claims with particularity. *See, e.g.*, *Aldridge v. Metro Life Ins. Co.*, No. 18-CVS-1050, 2019 NCBC LEXIS 116, at *113 (N.C. Super. Ct. Union Cnty. (Bus. Ct.) Dec. 31, 2019); *Beam v. Sunset Fin. Servs.*, No. 18-CVS-2925, 2019 NCBC LEXIS 56, at **18 (N.C. Super. Ct. Iredell Cnty. (Bus. Ct.) Sept. 3, 2019); *Rabinowitz v. Suvillaga*, No. 17-CVS-244, 2019 NCBC LEXIS 8, at *33 (N.C. Super. Ct. New Hanover Cnty. (Bus. Ct.) Jan. 28, 2019); *Provectus Biopharmaceuticals, Inc. v. RSM US LLP*, No. 17-CVS-10396, 2018 NCBC LEXIS 101, at *57 (N.C. Super. Ct. Mecklenburg Cnty. (Bus. Ct.) Sept. 28, 2018); *Herrera v. Charlotte Sch. of Law, LLC*, No. 17-CVS-1965, 2018 NCBC LEXIS 35, at *36 (N.C. Super. Ct. Mecklenburg Cnty. (Bus. Ct.) Apr. 20, 2018); *Bucci v. Burns*, No. 16-CVS-15478, 2017 NCBC LEXIS 83, at *7–8 (N.C. Super. Ct. Wake Cnty. (Bus. Ct.) Sept. 14, 2017); *Deluca v. River Bluff Holdings II, LLC*, No. 13-CVS-783, 2015 NCBC LEXIS 12, at *20 (N.C. Super. Ct. Brunswick Cnty. (Bus. Ct.) Jan. 28, 2015); *Al-Jamal v. Michael Baker Corp.*, No.5:12-CV-746-F, 2013 U.S. Dist. LEXIS 93676, at *18 (E.D.N.C. July 3, 2013) ("Plaintiff is cautioned that any fraud or negligent misrepresentation claims must comply with [Federal] Rule 9(b)'s pleading requirements."); *Rohlik v. I-Flow Corp.*, No. 7:10-CV-173-FL, 2011 U.S. Dist. LEXIS 73454, at *6 (E.D.N.C. July 7, 2011) ("[C]laims of negligent misrepresentation [also] fall within the purview of Rule 9(b)." (alterations in original)); *Suntrust Mortg., Inc. v. Busby*, 651 F. Supp. 2d 472, 484–85 (W.D.N.C. 2009) (applying Rule 9(b) to negligent misrepresentation fraud claims); *Madison River Mgmt. Co v. Bus. Mgmt. Software Corp.*, 351 F. Supp. 2d 436, 447 (M.D.N.C.

2005) (applying Rule 9(b) to negligent misrepresentation fraud claims); *Angell v. Kelly*, 336 F. Supp. 2d 540, 549 (M.D.N.C. 2004) (applying Rule 9(b) to negligent misrepresentation fraud claims); *Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 199 (M.D.N.C. 1997) (After noting a split among federal courts as to whether Rule 9(b) applies to claims for negligent misrepresentation, adopting the "approach that negligent misrepresentation . . . claims come within Rule 9(b).").

We hold that, in North Carolina, claims for negligent misrepresentation must satisfy the heightened pleading standard of North Carolina Rules of Civil Procedure Rule 9(b). A claim of negligent misrepresentation is "closely akin to fraud, differing primarily in the requisite state of mind of the purported actor." *Dealers Supply Co., Inc. v. Cheil Indus., Inc.*, 348 F. Supp. 2d 579, 590 (2004) (citing *Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 202 n.14 (M.D.N.C. 1997)). Similar to a claim for fraud or mistake, "negligent misrepresentation is based upon some 'confusion or delusion of a party such as by some misrepresentation.' " *Id.* at 590 (quoting *Breeden*, 171 F.R.D. at 203). The similarity of the claims supports the extension of Rule 9(b) to "all cases where the gravamen of the claim is fraud even though the theory supporting the claim is not technically termed fraud." *Id.* (quoting *Toner v. Allstate Ins. Co.*, 821 F. Supp. 276, 283 (D. Del. 1993)).

The key distinction between negligent misrepresentation claims and ordinary negligence claims is that the former requires proof not merely of a breach of duty, but also the additional requirement that the claimant *justifiably relied* to his detriment

on the information communicated without reasonable care. *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 206 (1988). As in a fraud case, we require the plaintiff to identify this alleged negligent misrepresentation with particularity so that the defendant can understand the time, place, and content of the representation, the identity of the person making the representation, and how the plaintiff justifiably relied on that information. *Cf. Terry*, 302 N.C. at 85. As a federal court succinctly explained when applying Rule 9(b) to negligent misrepresentation claims, "[u]nless defendant and others share plaintiff's view of the situation, they will find it difficult to grasp plaintiff's claim." *Breeden*, 171 F.R.D. at 202.

Here, plaintiffs have not alleged the time, place, speaker, or the specific contents of the alleged misrepresentation purported in the claim. Aside from the pleaded facts related to the letter of intent, the Amended Complaint contained only one reference to any misrepresentation: "[d]uring a yearlong due diligence period and negotiations, PRA represented to [plaintiff Parthasarathy] that in addition to using [the Solutions] to provide services to PRA's customers, PRA also would sell or license [the Solutions] to other PRA customers, and, with few exceptions, to any customers VHS had developed relationships with prior to the acquisition." This lone statement does not identify who, specifically, made the misrepresentation, when it was made, where it was made, or the specific nature of the misrepresentation. Therefore, the 9(b) heightened standard of pleading with particularity has not been met. Accordingly, the trial court was correct to dismiss plaintiffs' claim of negligent

misrepresentation.

## IV.  Defendants' Motions for Summary Judgment

## A. Standard of Review

"The standard of review for summary judgment is de novo." *Forbis v. Neal*, 361 N.C. 519, 524 (2007). Summary judgment is appropriate when no genuine issue of material fact exists, and a party is entitled to judgment as a matter of law. *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523 (2012) (citing N.C.G.S. § 1A-1, Rule 56(c)). Rule 56(c) of the North Carolina Rules of Civil Procedure states that summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file . . . show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (2021). "A 'genuine issue' is one that can be maintained by substantial evidence." *Dobson v. Harris*, 352 N.C. 77, 83 (2000). In review of the motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *Id.*

Contract interpretation is a question of law. *Wachovia Bank & Tr. Co. v. Westchester Fire Ins. Co.*, 276 N.C. 348, 354 (1970). When interpreting a contract, the Court should presume that the words of the agreement were deliberately selected and be given their plain meaning. *Briggs v. American & Efird Mills, Inc.*, 251 N.C. 642, 644 (1960).

## B. Breach of the APA

Under Delaware law, courts "interpret contracts as a whole," "will give each provision and term effect, so as not to render any part of the contract mere surplusage," and "will not read a contract to render a provision or term meaningless or illusory." *In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39, 56 (Del. 2019) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010). "When the contract is clear and unambiguous, we will give effect to the plain-meaning of the contract's terms and provisions." *Id.* at 56–57 (quoting *Osborn*, 991 A.2d at 1159–60). It is true that under Delaware law the implied covenant of good faith and fair dealing "inheres in every contract," *Chamison v. HealthTrust*, 735 A.2d 912, 920 (Del. Ch. 1999), and may be used to imply terms for "developments that could not be anticipated." *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010). However, the covenant of good faith and fair dealing "is not an equitable remedy for rebalancing economic interests after events that could have been anticipated." *Id.* at 1128. Indeed, the covenant of good faith and fair dealing should not be applied "to give the plaintiffs contractual protections that 'they failed to secure for themselves at the bargaining table.'" *Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 816 (Del. 2013) (quoting *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1260 (Del. 2004).

### 1. *Sections 2.6(a)(i) and (ii) of the APA*

The trial court granted defendants' motion for summary judgment for

plaintiffs' breach of contract claims as related to Sections 2.6(a)(i) and (ii) of the APA. We affirm the trial court's order granting summary judgment.

Schedules 2.6(a)(i) and (ii) permit PRA to "reasonably determine" completion of the first and second software development earnout milestones. Plaintiffs assert that defendants breached the terms of the APA by failing to reasonably exercise their contractually afforded discretion to determine the completion of Integration Milestones (i) and (ii). "When a contract confers discretion on one party, the implied covenant requires that the discretion be used reasonably and in good faith." *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146–47 (2009). Essentially, plaintiffs claim that PRA violated the implied covenant of good faith and fair dealing.

A plaintiff may rely on the implied covenant when there is a gap in the contract and a defendant behaves in an unexpected manner, "thereby frustrating the fruits of the bargain that the asserting party reasonably expected." *Nemec*, 991 A.2d at 1126. Stated another way, breach of the implied covenant is a claim available to a plaintiff who could not have contracted around a defendant's allegedly arbitrary or unreasonable behavior. *Id.* That is not the circumstance here.

The record presents evidence that during negotiations, PRA devised a list of functional deficiencies that were later incorporated into the APA as milestones. The record also presents evidence that the first milestone "was so loosely worded it can be argued either way" and that partial achievement of milestone two was "grey." Further, Parthasarathy acknowledged, in 2016 November via email, that milestones

(i) and (ii) were partially done.

Following execution of the APA, it quickly became apparent that completing the milestones would be very difficult if not impossible. However, plaintiff Parthasarathy has "a right to enter into good and bad contracts, the law enforces both." *Nemec*, 991 A.2d at 1126. This Court will not utilize the nebulous covenant of good faith and fair dealing to "rewrite a contract" that a plaintiff "now believes to have been a bad deal." *Id.*

Parthasarathy, a sophisticated party and highly experienced software developer, could have anticipated the potential difficulties of these milestones. Parthasarathy could have declined to agree that the determination of milestone completion rested on the discretion of PRA. Defendants could have negotiated for these milestones to be performed on a sliding scale, or negotiated for the milestones to be revaluated at a certain point in time with a buyout/buyback if deemed unattainable. Plaintiffs could have declined to agree to incorporate into the APA the functional gaps[3] discussed during negotiations. Plaintiff Parthasarathy complains that defendants allocated inadequate resources towards completion of the milestones—Parthasarathy could have and should have anticipated the need for adequate resources and contracted for such allocations.

---

[3] The functional gaps discussed by the parties during negotiations are not to be confused with a contractual gap in the context of contractual construction, and as discussed in this opinion. In this opinion, for the sake of clarity, the functional gaps will be referred to as the functional deficiencies.

Plaintiffs have not presented evidence of a disputed issue of fact that PRA did not act reasonably and in good faith in determining that plaintiffs failed to meet milestones (i) and (ii). Simply put, the milestones required certain tasks to be completed. Because those tasks were not completed, defendants determined the milestones had not been met. The "implied [covenant of ]good faith cannot be used to circumvent the parties' bargain." *MHS Capital LLC v. Goggin*, 2018 Del. Ch. LEXIS 151 at *30–31 (quoting *Dunlop v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005). Thus, plaintiffs have presented no evidence on which to base the existence of a triable issue of material fact sufficient to survive defendants' Motion for Summary Judgment.

Establishing the existence of a contractual gap is essential because the "implied covenant applies only if the contract is silent as to the subject at issue." *Id.* The "implied covenant of good faith and fair dealing involves inferring contractual terms to handle developments or contractual gaps that neither party anticipated." *Nationwide Emerging Managers, LLC v. NorthPointe Holdings*, LLC, 112 A.3d 878, 896 (Del. 2015) (cleaned up) quoting *Nemec*, 991 A.2d at 1125. "It does not apply when the contract addresses the conduct at issue." *Id.*

This contract is not silent on these contested actions. The APA expressly states that milestone (i) is triggered "upon completion of the integration of the parties' Salesforce environments set forth on Schedule 2.6(a)(i)." Schedule 2.6(a)(i) provides that integration "shall be deemed completed when, as reasonably determined by

Purchaser, [CTMax] (A) sufficiently shares all core data with the PRA Salesforce Modules and (B) does not conflict with the functionality of the PRA Salesforce Modules." The APA then provides a non-exclusive list of what is included in the "PRA Salesforce Modules." Schedule 2.6(a)(ii) required that a list of specific "key product enhancements" be completed on a "substantially error-free basis, as reasonably determined by" PRA. The contract also states that milestone (ii) is triggered "upon completion of key product enhancements set forth in Schedule 2.6(a)(ii)." Schedule 2.6(a)(ii) provides the completion of key product enhancements "shall be deemed to have occurred when all of the following functions are available and operating on a substantially error-free basis, as reasonably determined by Purchaser, as part of [CTMax]." The APA is not silent on this issue; thus, there is no contractual gap to be filled by the implied covenant, making application of the implied covenant unnecessary and inappropriate here.

### 2. Breach of APA Section 2.6(b)

The trial court granted defendants' Motion for Summary Judgment for plaintiffs' claim that defendants breached section 2.6(b) of the APA. We disagree with the trial court's decision and find that plaintiffs have met the threshold of presenting evidence to show a genuine issue of material fact does exist. *See Lowe v. Bradford*, 305 N.C. 366, 370 (1982).

Plaintiffs contend that defendants breached section 2.6(b) of the APA in two ways: (1) by conditioning all work on the third software Development Milestone on

the completion of the first and second Development Milestones; and (2) by conditioning all External Sales on the completion of the three software Development Milestones.

Section 2.6(b) is titled "Independence of Contingent Payments," (the Independent Milestone Provision or IMP). The trial court and all parties agree that the IMP provides that PRA cannot make payment for achievement of any milestone conditioned on having completed a prior milestone. The trial court determined that the IMP *only* prohibits conditional payments. However, this interpretation ignores the independent nature of the IMP. Contrary to what the trial court held, the IMP also unambiguously provides that satisfaction of the criteria of one milestone is not contingent on satisfaction or completion of the criteria of any other milestone.

Defendants argue that the IMP's use of the word "payments" limits application of the IMP to only defendants' obligation of payments and does not address the manner in which PRA may condition all External Sales on the completion of the three software Development Milestones. This argument is not persuasive.

Under Delaware law, "contracts are to be interpreted 'as a whole,'" and this Court should "give each provision and term effect, so as not to render any part of the contract mere surplusage," and "not read a contract to render a provision or term meaningless or illusory." *In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d at 56–57 (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)).

Following defendants' logic, 2.6(b) "independence" is limited to only how and when payments are to be made—that defendants are not bound to pay for milestone (i) simply because milestone (ii) is completed. Conversely, defendants are bound to pay for milestone (ii) upon completion even if milestone (i) is not complete. But this reading would render the IMP in 2.6(b) duplicative of 2.6(a), rendering it meaningless, contrary to principles of contract construction. *See id.* at 56–57.

Put another way, defendants' interpretation is that 2.6(a) does not state how a milestone payment is earned, because it leaves room for prerequisites not contemplated by 2.6(a). Defendants would have it that, but for 2.6(b), plaintiffs could complete milestone (ii) and still not be owed payment if they have not completed milestone (i). While Defendants argue that 2.6(b) means PRA cannot withhold *payment* for completion of a milestone based on incompletion of another, PRA may still *condition*—in an undefined and unspecified manner—pursuit of a milestone until completion of another. This unreasonable interpretation is such "that no reasonable person would have accepted when entering the contract," thus producing an absurd result. *Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (2021) (quoting *Osborn*, 991 A.2d at 1160).

Additionally, the IMP even goes so far as to give an example of how the IMP should apply, "[f]or the avoidance of any doubt:"

> [I]f the conditions precedent to the payment of the First Milestone Payment for the First Milestone Period are not satisfied, but the conditions precedent to the payment of the Second Milestone Payment for the Second Milestone

> Period are satisfied, then Purchaser would be obligated to pay such Second Milestone Payment for the Second Milestone Period for which the corresponding conditions precedent have been satisfied, and not the First Milestone Payment for the First Milestone Period.

The negotiating parties knew how to illustrate their intentions. Thus, if they intended that completion of certain milestones be required before others could be pursued, the parties could have also illustrated that "for the avoidance of any doubt." The example provided in the APA evidences that the parties contemplated and intended that a subsequently listed milestone is contingent only on its respective requirements and the milestones have concurrently running deadlines for completion.

Plaintiffs have presented evidence tending to support their assertion that defendants did condition certain milestones on the completion of others, in breach of the express terms of the contract. When viewing these facts in a light most favorable to plaintiffs, and thus presenting a triable issue of material fact, summary judgment was not appropriate here. *See Lowe*, 305 N.C. at 370.

Specifically, Irene testified that completion of the first two milestones was made a dependency to the third milestone. Additionally, Irene testified that PRA's "primary purpose [in acquiring the software] was to use the system for PRA and then, also to commercialize it *in that order*." (Emphasis added.) When viewed in the light most favorable to plaintiffs, this is evidence of PRA acting in violation of the express terms of the contract and summary judgment is not appropriate.

Defendants argue further that this claim is barred by the three-year statute of

limitations. N.C.G.S. § 1-52(1); 10 Del. C. 8106. To preserve an issue for appeal, N.C. R. App. P. 10(a)(1) requires a party to have "presented to the trial court a timely request, objection, or motion . . . and to obtain a ruling upon the party's request, objection, or motion." While defendants did plead that some or all of plaintiffs' claims are time barred, this argument was not presented to the trial court and no ruling was obtained. Therefore, we decline to reach the issue of whether any claim is time barred by the statute of limitations, because this issue is not before this Court.

### 3. *Breach of Contract Associated with the External Sales Provisions*

The trial court granted defendants' Motion for Summary Judgment as related to plaintiffs' claim that defendants breached the express and implied terms of the APA External Sales provisions. We disagree with the trial court's grant of summary judgment for defendants on this claim and remand the issue for further proceedings.

The trial court misconstrued the definition of the unambiguous contract term "External Sale." The APA defines "External Sale" as "the sale of one or more licenses . . . to a third party which is not (i) an Affiliate of Purchaser or (ii) using such license(s) in connection with providing services to Purchaser and/or any of its Affiliates." The trial court correctly hones in on the key language of the APA: "the sale of one or more licenses to the Solutions by [PRA] . . . to a third party." However, the trial court ultimately makes a misstep in the analysis by giving credence to defendants' argument that there has been no "External Sale" without a specific fee or payment attributable solely or separately to the license.

The plain meaning of "sale" is: "the transfer of property . . . for a price." *Sale*, MERRIAM-*Webster's Collegiate* DICTIONARY (11th ed. 2007). In the context of the Takeda Master Services Agreement (MSA), Section 7.02(b) of the MSA refers to the transfer as "License to [PRA] Owned Technology." As the trial court found, " 'License' is a familiar term when used in connection with software, typically meaning a limited right to access and use a software product owned by another entity."

The Takeda MSA closely mirrors the APA definition of "External Sale." As part of a bundle including the use of the software and providing services to Takeda, and in exchange for a price of approximately $491 million over a term of years, PRA transferred a license to Takeda; Takeda is neither an affiliate of PRA nor providing a service to PRA.

Defendants appear to be arguing that they have excluded the transaction with Takeda from the APA definition of "External Sale" by simply bundling the transfer of the license as part of a service package and by not including an invoice line item of the license. This interpretation is unreasonable and produces an absurd result. *Manti Holdings, LLC*, 261 A.3d at 1208.

Moreover, defendants could have contracted around the issue of a line-item requirement if such a carve out was truly an intended part of the bargain. In the APA, defendants excluded from the realm of "External Sale" "(i) an Affiliate of Purchaser or (ii) using such licenses in connection with providing services *to Purchaser* and/or any of its Affiliates." (Emphasis added.) The parties could have included a third carve

out: "(iii) license bundled within a software as a service agreement in connection with PRA providing services *to a third-party*." *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 816 (Del. 2013) (quoting *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1260 (Del. 2004). Defendants did not do so. Furthermore, defendants' own expert witness, Bryan Haas, testified that "software as a service is not always a license. Sometimes it's just that you have access to use [it]." It seems that a license did not necessarily have to be issued to provide this service to Takeda. Nevertheless, PRA issued a license to Takeda and called it a license in the MSA.

To be sure, this Court is not suggesting that if PRA were to simply refuse to use the term "license" for a transfer of software that it would be excluded from the definition of "External Sale." Instead, what this Court is saying is that, here, in this circumstance, the Takeda MSA specifically included, for a price, the transfer of a license to use the "PRA[ ] Owned Technology." What is unknown is whether the Takeda MSA was drafted such that Takeda was required to pay consideration to acquire and use a license of the Solutions. Therefore, defendants' failure to pay for the transfer of the license to Takeda under the MSA, as required by the APA, may be a breach of contract.

We hold that the Takeda contract could be an "External Sale." This Court remands this issue to the trial court to determine whether the Takeda MSA was drafted such that Takeda was required to pay consideration to acquire and use a license of the Solutions. Because we hold that "External Sale" is an unambiguous

contract term and that defendants could have contracted around the issue of a line item requirement, if such was truly intended in the bargain, we further hold that the application of the covenant of good faith and fair dealing does not apply to this case. *Id.* On remand the trial court may find there is a need for additional discovery to determine if there are other external contracts that include transfer of licenses to the Solutions, either in effect, or that were specifically termed as such and which required consideration in exchange for the Solutions.

When viewed in the light most favorable to plaintiffs, the Takeda MSA could meet the definition of an "External Sale." This possibility constitutes more than substantial evidence that PRA breached the APA by engaging in external sales, thereby creating a genuine issue of material fact. Thus, this Court overturns the trial court's decision to grant summary judgment on defendants' breach of contract term as related to the External Sales provisions.

## C. Alleged Misrepresentations PRA Made in the Letter of Intent

The trial court granted summary judgment in favor of defendants on plaintiffs' claims of intentional misrepresentation and fraudulent inducement based on representations contained in the LOI. We agree with the trial court's order and affirm summary judgment.

There must be evidence of a misrepresentation of existing "or ascertainable facts, as distinguished from a matter of opinion or representation relating to future prospects." *Ragsdale v. Kennedy*, 286 N.C. 130, 139 (1974) (citing *Berwer v. Union*

*Cent. Life Ins. Co.*, 214 N.C. 554 (1938)). "[U]nfulfilled promises cannot be made the basis for an action of fraud." *Williams v. Williams*, 220 N.C. 806, 810 (1942).

In support of their argument that misrepresentations were made in the LOI, plaintiffs point to evidence occurring *after* the LOI was signed. For example, plaintiffs raise PRA's internal discussions at a board meeting during which plaintiffs claim that PRA disclosed its alleged plan not to sell the Solutions and its intent to block competitors from acquiring the Solutions. This meeting occurred in December 2014. Yet, the LOI was executed on 15 October 2014. Plaintiffs also point to the "ability to earn" language contained in the LOI, upon which plaintiffs claim to have relied. The trial court, quoting *Ragsdale*, found that this language "is, by its very nature, a statement of future intent or a 'representation relating to future prospects.' " 286 N.C. at 139. Notably, the "ability to earn" language is not present in the APA.

The LOI expressly provided that it was a nonbinding document and contemplated a more complete future agreement. *See Ragsdale*, 286 N.C. at 139 (an action for fraud cannot be predicated on future conduct); *see also Triad Packaging, Inc. v. SupplyOne, Inc.*, 597 F. App'x 734, 739–40 (4th Cir. 2015) (applying North Carolina law to find that a party's statements regarding the sale price and closing date in a nonbinding letter of intent were "classic projections, exemplified by the letter's non-binding nature . . . [and] cannot, therefore, form the basis of a fraud claim"). Further, an intentional misrepresentation must be "definite and specific." *Ragsdale,* 286 N.C. at 139. On this basis, the trial court determined that "[t]he LOI

contains fulsome disclaimers making it clear that its contents should not be relied upon by any party to the transaction, and that any reliance on its terms are solely at the relying party's risk." We agree.

As aptly noted by the trial court, plaintiffs have cited no authority from North Carolina or other jurisdictions in which a court has recognized a claim arising out of representations contained in a letter of intent. This is not the case in which this Court should recognize such a claim.

We hold that this LOI cannot form the basis of a fraud claim. Accordingly, we hold that the trial court was correct in granting summary judgment in favor of defendants for plaintiffs' claims of intentional misrepresentation and fraudulent inducement based on representations contained in the LOI.

**D. Alleged Misrepresentations PRA Made about Amending the APA**

The trial court granted summary judgment in favor of defendants on plaintiffs' claims of intentional misrepresentation and fraudulent inducement based on statements made by Shannon and Jones-Hertzog regarding possible amendments to the APA. We affirm the trial court's order on this issue.

Plaintiffs claim that PRA's alleged post-APA representations stating that it would amend the APA milestones were fraudulent and that PRA never intended to amend the APA milestones. However, the trial court found that evidence in the record supports the notion that PRA was attempting to amend and engaged in negotiations with plaintiff Parthasarathy regarding a potential amendment of the APA

milestones.

Specifically, in December 2016, Shannon asked Jones-Hertzog to work with Munn on amending the milestones. Additionally, Jones-Hertzog reached out to Irene for input on an amendment. Irene also met in person with plaintiff Parthasarathy and discussed amendment. On 15 December 2016, potential amendments were shared internally at PRA. Evidence in the record establishes that in January 2017 an amendment framework was again shared internally at PRA. The record reveals that in May 2017, Jones-Hertzog told plaintiff Parthasarathy that she was awaiting approval of a proposed amendment.

Failure to reach an agreement on the amendment of the milestones does not support a finding that PRA knew it was false at the time it represented that PRA would work towards an amendment. *See Williams*, 220 N.C. at 810 ("It is generally held . . . that mere unfulfilled promises cannot be made the basis for an action of fraud.").

Plaintiffs have not presented evidence of a genuine issue of material fact as to whether defendants' statements regarding amendment were false at the time the statements were made. Thus, the trial court was correct in granting summary judgment in favor of defendants on this issue.

**E. Unfair and Deceptive Trade Practice Act**

This Court affirms the trial court's order grant of summary judgment in favor of the defendants regarding plaintiffs' claim under the Unfair and Deceptive Trade

Practice Act (UDTPA). "Whether an act found to have occurred is an unfair or deceptive practice which violates N.C.G.S. § 75-1.1 is a question of law for the court." *Nobel v. Foxmoor Grp., LLC*, 380 N.C. 116, 119 (2022).

Establishing a prima facie claim for unfair and deceptive trade practices requires a plaintiff to show: "(1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *SciGrip, Inc. v. Osae*, 373 N.C. 409, 426 (2020) (quoting *Dalton v. Camp*, 353 N.C. 647, 656 (2001)). "[U]nfairness or 'deception either in the formation of [a] contract or in the circumstances of its breach' may establish the existence of substantial aggravating circumstances sufficient to support an unfair and deceptive trade practices claim." *Id.* (quoting *Bartolomeo v. S.B. Thomas, Inc.*, 889 F.2d 530, 535 (4th Cir. 1989)). Notably, most employer-employee disputes fall outside the purview of the UDTPA. *Dalton*, 353 N.C. at 657.

Plaintiffs allege that defendants violated the UDTPA by negotiating the PRA under false pretenses, interfering with the APA milestones, and terminating plaintiff Parthasarathy's employment. Plaintiffs' UDTPA claim is an attempted second bite at the apple and, as the trial court stated, is a repackaging of the breach of contract and fraud claims. Setting aside the termination of Parthasarathy, this claim amounts to an allegation that PRA did not perform under the terms of the contract. This allegation does not support a finding of the required "substantial aggravating circumstances" attending the breach. *See SciGrip, Inc.*, 373 N.C. at 427 ("[A]n

intentional breach of contract, standing alone, simply does not suffice to support the assertion of an unfair and deceptive trade practices claim.").

Moreover, plaintiffs have not presented any evidence that identifies a genuine issue of material fact to survive summary judgment on their UDTPA claim. Specifically, plaintiffs argue that an internal presentation to PRA's board shows that PRA did not intend to sell the software externally. However, the record reveals that at the internal presentation defendants considered VHS's software as "[r]evenue generating technology," and mirrored the milestone framework of the APA.

Plaintiffs allege that PRA acted fraudulently during negotiations by feigning interest in selling the software only to decline to pursue those sales until after the software was fully enhanced. However, aside from plaintiff Parthasarathy's own words, there is nothing in the record to support this assertion. Rather, the record contradicts this assertion. Specifically, the testimony of Chuck Piccirillo, PRA's Senior Vice President of IT, recounts internal discussions within PRA about "getting into software selling." Piccirillo also recounts a conversation between PRA staff and plaintiff Parthasarathy during which it was explained that functional deficiencies in the software would need to be addressed prior to selling. The record also contained Shannon's deposition testimony that the negotiations made clear that the software could not be sold until modifications were made. Plaintiff Parthasarathy's testimony standing alone is not substantial evidence of a material fact to survive summary judgment. *See Lowe*, 305 N.C. at 369 ("An issue is 'genuine' if it can be proven by

substantial evidence and a fact is 'material' if it would constitute or irrevocably establish any material element of a claim or a defense.").

The record does not support plaintiffs' assertion that PRA's promises to amend the APA were false, see sections I. E. and IV. D, *supra*. Thus, even after reviewing these claims in the light most favorable to the plaintiffs, we find no genuine issue of material fact exists for plaintiffs' allegations that PRA never intended to sell the software.

Lastly, plaintiffs assert that Parthasarathy's termination was unfair—specifically that PRA terminated Parthasarathy in an inequitable assertion of power. However, unless PRA's conduct is "egregious enough" to "overcome the longstanding presumption against unfair and deceptive practices claims as between employers and employees," plaintiff will not prevail. *Dalton*, 353 N.C. at 658.

What the record shows is that the employment agreement at issue states that Parthasarathy will have the "status and responsibilities as determined from time to time" by PRA's "CEO or the CEO's designee." In North Carolina, an at-will employment State, "in the absence of a contractual agreement between an employer and an employee establishing a definite term of employment, the relationship is presumed to be terminable at the will of either party without regard to the quality of performance of either party." *Kurtzman v. Applied Analytical Indus., Inc.*, 347 N.C. 329, 331 (1997). Subject to a few limited exceptions not relevant here, an at-will employee may be terminated "for no reason, or for an arbitrary or irrational reason."

*Coman v. Thomas Manufacturing Co.*, 325 N.C. 172, 175 (1989) (quoting *Sides v. Duke Univ.*, 74 N.C. App. 331, 342 (1985)). Thus, a high threshold must be overcome to surpass the at-will employment presumption. *See Kurtzman*, 347 N.C. at 331. Here, that threshold has not been surpassed. Accordingly, the trial court was correct in granting summary judgment in favor of defendants for plaintiffs' UDTPA claim.

## V.     Second Motion to Amend the Complaint

### A. Standard of Review

"A motion to amend is addressed to the [sound] discretion of the trial court. Its decision will not be disturbed on appeal absent a showing of abuse of discretion." *Isenhour v. Universal Underwriters Ins. Co.*, 345 N.C. 151, 154 (1996) (alteration in original) (quoting *Henry v. Deen*, 310 N.C. 75, 82 (1984)). An abuse of discretion occurs when the trial court's decision is "manifestly unsupported by reason" or is "so arbitrary that it could not have been the result of a reasoned decision." *Piazza v. Kirkbride*, 372 N.C. 137, 144 (2019) (quoting *White v. White*, 312 N.C. 770, 777 (1985)).

### B. Motion for Leave to File an Amended Complaint

The trial court denied plaintiffs' motion for leave to file a Second Amended Complaint on the basis of undue delay and material prejudice to the defendants. We hold that the trial court did not abuse its discretion and affirm the trial court's order denying plaintiffs' motion for leave to amend.

Once an answer has been served, a plaintiff may only amend their pleading by

leave of court or written consent of the adverse party. N.C.G.S. § 1A-1, Rule 15(a) (2021). Leave to amend lies within the trial court's discretion, though should be freely given "when justice so requires." *Id.* "Among proper reasons for denying a motion to amend are undue delay . . . and unfair prejudice to the nonmoving party." *Azure Dolphin, LLC v. Barton*, 371 N.C. 579, 603 (2018).

Plaintiffs argue that the trial court's denial was not based in law, thus, an abuse of discretion. Plaintiffs further contend that the trial court's ruling is contrary to the notion that "leave [to amend] shall be freely given when justice so requires." N.C.G.S. § 1A-1, Rule 15(a). This argument is not persuasive. Review of the trial court's order demonstrates plentiful justification for denying plaintiffs' motion to amend. Specifically, the trial court noted that plaintiffs had previously amended their complaint and that the amendment contained extensive revisions. The trial court further noted that discovery had closed, with thousands of documents having been exchanged. The parties had fully briefed the motion to dismiss plaintiffs' Amended Complaint. The trial court then concluded that leave to amend would cause material prejudice to defendants and undue delay. Considering the reasoning provided by the trial court, we hold that the trial court did not abuse its discretion in denying plaintiffs' motion for leave to file a Second Amended Complaint.

**VI. Discovery Motion Under Business Court Rule 10.9**

**A. Standard of Review**

A trial court's discovery ruling is subject to an abuse of discretion standard and

"will be overturned 'only upon a showing that its ruling was manifestly unsupported by reason and could not have been the result of a reasoned decision.' " *Friday Invs., LLC v. Bally Total Fitness of the Mid-Atl., Inc.*, 370 N.C. 235, 241 (2017) (quoting *In re Foreclosure of Lucks*, 369 N.C. 222, 228 (2016)).

**B. Business Court Rule 10.9**

We hold that the trial court's denial of plaintiffs' discovery request was not an abuse of discretion. Accordingly, we affirm the trial court's denial of plaintiffs' Third Discovery Request.

Business Court Rule 10.9 "applies to motions under Rules 26 through 37 and Rule 45 of the Rules of Civil Procedure." BCR 10.9(a). The trial court acted within the scope of Rule 10.9 in denying plaintiffs' request. Rule 26 states: "[t]he frequency or extent of use of discovery methods . . . *shall be limited by the court if it determines that*:

> (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) *the discovery is unduly burdensome or expensive, taking into account the needs of the case, the amount in controversy, limitations on the parties' resources, and the importance of the issues at stake in the litigation. The court may act upon its own initiative after reasonable notice . . . .*

N.C.G.S. § 1A-1, Rule 26(b)(1a) (2021) (emphasis added).

Rule 26 requires the need for information by one party be balanced against the "likelihood of an undue burden imposed upon the other." *Willis v. Duke Power Co.*,

291 N.C. 19, 34 (1976). Additionally, North Carolina trial courts are vested with broad authority to manage cases in their dockets, including discovery issues. *See, e.g., Beard v. N.C. State Bar*, 320 N.C. 126, 129 (1987) (explaining that trial courts retain inherent authority "to do all things that are reasonably necessary for the proper administration of justice"). Rule 26 grants the trial court, even acting on its own initiative, broad discretion to limit the frequency and extent of discovery. N.C.G.S. § 1A-1, Rule 26(b)(1a).

On 25 November 2019, plaintiffs renewed their previously submitted Rule 10.9 request (the Third Discovery Request), to which defendants objected as irrelevant, unduly burdensome, and time consuming. Specifically, defendants argued that such an order would require defendants to review hundreds of customer agreements and alert customers before producing the contents of any agreements. Defendants also expressed concern that the customers whose contracts may be within the scope of production could, before release, object to disclosure of their contract information. Additionally, defendants contended that plaintiffs' discovery request would include "*all* financial information for *every* PRA customer agreement which includes as part of its terms a general license to access PRA's technology."

In response, plaintiffs argued that the previously produced contract with Takeda constitutes an "External Sale" under the APA. As such, plaintiffs needed to determine what similar contracts existed and which similar contracts would result in "additional External Sales underlying damages." To that end, plaintiffs requested

production of all documents showing "sales, revenue, and profit[s]" arising from any of the contracts and agreements it sought. Plaintiffs also sought production of "all contracts or agreements of any kind" between PRA and its customers in which PRA has granted the customer "a license in, access to, or use of in any manner whatsoever, [of] any version of [the Solutions], whether express or implied, direct or indirect, alone, or in combination with any other software, products, or services," or in which PRA has agreed to provide products or services to its customers "using any version of [the Solutions] . . . whether express or implied, direct or indirect, alone, or in combination with any other software, products, or services."

As a pre-filing requirement to a discovery motion, Rule 10.9 mandates that the parties "engage in a thorough, good-faith attempt to resolve or narrow the dispute. If the dispute remains unresolved, then the party seeking relief must e-mail a summary of the dispute" to the trial court. BCR 10.9(b)(1). As required by Rule 10.9(b)(1) and Rule 10.9(b)(2), on 5 September 2019, plaintiffs emailed Plaintiffs' Rule 10.9 Summary of Discovery Dispute, along with Certificate of Compliance with BCR Rule 7.8. On 24 September 2019, the trial court advised the parties, by email, that "the dispute underlying the 10.9 [request was] not sufficiently ripe for the [c]ourt to provide reasonable guidance." Plaintiffs later advised the trial court by email, on 25 November 2019, that "the parties have conferred a few additional times but continue to be at an impasse on the same set of issues and could use the [c]ourt's guidance to help resolve them."

Pursuant to Rule 10.9, the trial court "schedule[d] a telephone conference with counsel to discuss the dispute." BCR 10.9(b)(3). The telephone conference was held on 9 December 2019. Rule 10.9 provides that the court may "order the parties to file a motion and brief regarding the dispute . . . or issue an order that decides the issues raised or that provides the parties with further instructions." *Id.* Consistent with the Rule, "the [c]ourt . . . decide[d] the parties' dispute during the conference" by denying the Third Discovery Request. *Id.*

Plaintiffs now argue that the trial court abused its discretion by converting an informal and required email request into a motion to compel. Specifically, plaintiffs argue that the trial court converted the 25 November 2019 email into a motion to compel. We do not agree. Nothing in the record indicates that the trial court made such a conversion. Rather, in the Background Section of the Order, the trial court stated, "During the conference, the Court advised counsel that due to the late stage of discovery in this case and its concern that requiring PRA to produce the requested documents would be unduly burdensome and could unnecessarily cause a lengthy delay in resolving this case, the Court was *inclined to deny a motion to compel* PRA to respond to the Third Request." (Emphasis added.)

The Order in no way characterized the plaintiffs' email as a motion to compel. Instead, after "propos[ing] that the parties move for summary judgment on the issue of whether . . . the Takeda Agreement constituted an External Sale under the APA," the trial court indicated that it would compel production if the plaintiff prevailed on

that issue. At best, this language contemplates a potential future motion to compel that may be filed. Moreover, the trial court denied the Rule 10.9 request *"without prejudice* to the [c]ourt issuing a later order, following disposition of summary judgment motions, compelling PRA to produce the documents and information sought in the Third Request." (Emphasis added.) In supporting its denial, the trial court reasoned that the request was unduly burdensome at this late stage of discovery and would unnecessarily cause delay in resolving this case, without first determining the issue regarding External Sales under the APA.

We hold that the trial court complied with both Business Court Rule 10.9 and Rule 26 of the Rules of Civil Procedure and that the denial of the Rule 10.9 discovery request was not an abuse of discretion. However, given this Court's holding that the Takeda contract does constitute an "External Sale" under the APA, what further discovery that may be appropriate, if any, is an open question for the trial court to address upon remand.

## VII.    Conclusion

We affirm in part and reverse in part the trial court's order in this case. We affirm the trial court's order for all issues except for the order granting defendants' motion for summary judgment on the issues of breach of the APA section 2.6(b) and the External Sales provisions. Further, we hold that the trial court did not abuse its discretion by denying plaintiffs' discovery motion under Rule 10.9. Given that this Court hereby overturns the trial court's order for summary judgment on the breach

of the APA regarding the External Sales provisions, determining that the Takeda MSA may be an "External Sale," the issue of further discovery should be reconsidered by the trial court.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

Justice EARLS concurring in part and dissenting in part.

While I agree with the majority on many of the issues presented in this case, I disagree on three issues. First, I concur with the majority holding that plaintiffs' complaint is insufficient to plead the claim of negligent misrepresentation under the North Carolina Rules of Civil Procedure. However, I disagree that Rule 9(b) is the proper standard for this inquiry. *See* N.C.G.S. § 1A-1, Rule 9(b) (2021). Instead, in my view the clear language of the rules means that negligent misrepresentation claims are only subject to the pleading standard of Rule 8. *See* N.C.G.S. § 1A-1, Rule 8 (2021). Second, regarding the defendants' Motion for Summary Judgment as it relates to the plaintiffs' breach of contract claim under sections 2.6(a)(i) and (ii) of the Asset Purchase Agreement (APA), I would hold that under Delaware law the implied covenant of good faith and fair dealing applies to this case and thus summary judgment for defendants on this claim is not warranted.

Third, I would hold that under Delaware law the implied covenant of good faith and fair dealing applies to Pharmaceutical Research Associates, Inc.'s (PRA) post-closing conduct and that summary judgment for defendants is not appropriate as to whether PRA breached the implied terms of the APA's External Sales provision, as a reasonable jury could find that: (1) PRA sequenced the milestones such that work could not begin on the second and third milestones until work on the first milestone was completed; (2) PRA sequenced the External Sales Milestone by not allowing work

to begin on External Sales until after work on the first three Development Milestones was completed; (3) when PRA unmanaged the software package it diverted resources away from the APA milestones and eliminated the possibility of licensing the software on the AppExchange[1] and thwarted Parthasarathy's efforts to meet the External Sales provision; and (4) PRA's interference with the Vertex deal was intentional.

## I. Motion to Dismiss

On review, the dismissal of a claim under Rule 12(b)(6) is subject to de novo review. *Bridges v. Parrish*, 366 N.C. 539, 541 (2013). A dismissal is warranted when "(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Krawiec v. Manly*, 370 N.C. 602, 606 (2018) (quoting *Wood v. Guilford Cnty.*, 355 N.C. 161, 166 (2002)). In evaluating the party's complaint, this Court must "take the allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *See New Hanover Cnty. Bd. of Educ. v. Stein*, 380 N.C. 94, 106–07 (2022).

## A. Negligent Misrepresentation

"The tort of negligent misrepresentation occurs when a party justifiably relies

---

[1] Salesforce's AppExchange is the online platform where VHS had planned to license or sell its software to customers.

to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 206 (1988). "[T]o establish justifiable reliance a plaintiff must sufficiently allege that he made a reasonable inquiry into the misrepresentation and allege that he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence." *Arnesen v. Rivers Edge Golf Club & Plantation, Inc.*, 368 N.C. 440, 454 (2015) (cleaned up).

While the trial court applied the heightened Rule 9(b) pleading standard, negligent misrepresentation is properly pled under Rule 8's notice pleading standard. *See* N.C.G.S. § 1A-1, Rule 8; *see also Raritan River Steel Co.*, 322 N.C. at 207–08. Under Rule 8, a complaint must contain "[a] short and plain statement of the claim sufficiently particular to give the court and the parties notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved showing that the pleader is entitled to relief." N.C.G.S. § 1A-1, Rule 8(a). The majority asserts that a claim for negligent misrepresentation is similar to a claim for fraud and accordingly, the two require the same pleading standard under North Carolina Rule of Civil Procedure 9(b). However, Rule 9(b) does not apply to negligent misrepresentation, and the language of the rule specifically states that "[i]n all averments of fraud, duress or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." N.C.G.S. § 1A-1, 9(b). Thus, while Rule 9(b) clearly applies to a claim of fraud, it does not apply to claims for negligent

misrepresentation. *Id.*

Value Health Solutions, Inc. (VHS) and Neil Parthasarathy (together "VHS") assert that the amended complaint adequately pleads a claim for negligent misrepresentation. VHS argues that the gap analysis PRA conducted of the software allowed it to learn about the software's capabilities as well as identify any functions or features PRA may have wanted to develop further after acquiring it. According to VHS, the results of this analysis became the basis for the Letter of Intent (LOI) and APA. VHS alleges that despite PRA knowing the software would need to be developed further, this information was not shared with VHS. Thus, VHS alleges that PRA "failed to exercise care and competence in obtaining and communicating . . . to Mr. Parthasarathy and VHS regarding the timeline and development [of PRA's internal software platform] and the impact it would have on PRA's business and the timely completion of the milestones." VHS also contends that the information PRA did provide was "false or inaccurate" because "PRA knew or should have known that" its internal software development plans "would interfere and prevent the completion of the software and sales milestones." VHS notes that in the end, the technical requirements contained in each milestone "were a moving target" with many of them being "waived and abandoned" or "not required" in favor of other requirements. According to VHS, had it known that PRA would alter the milestones and condition them on one another it would have never entered into the APA with PRA. Lastly, VHS argues that its reliance on PRA was justified because PRA had " 'full' and

'unfettered' access to VHS's software, overall control of the due diligence process, and [the] opportunity to conduct any testing or analysis it desired."

While many of these allegations might support VHS's breach of contract claims, they do not allege that PRA made misstatements or misrepresentations about the technical requirements needed to integrate the software into PRA's internal platform. Moreover, the test for determining whether reliance was justifiable is whether the plaintiff "sufficiently allege[d] that he made a reasonable inquiry into the misrepresentation and allege[d] that he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence." *Arnesen*, 368 N.C. at 454 (cleaned up). VHS does not argue that it made a reasonable inquiry into PRA's alleged misstatements, nor does it argue that it was denied the opportunity to investigate or that even if it had investigated, it could not have learned the true facts. *See id.*

Furthermore, to make a claim for negligent misrepresentation a party must allege that a duty of care existed. *Raritan River Steel Co.*, 322 N.C. at 206. VHS cannot meet this standard because the alleged negligent misrepresentation occurred as the result of an arm's-length transaction. An "[a]rm's-length transaction[ ] encompass[es] dealings between two parties who are not related or not on close terms and who are presumed to have roughly equal bargaining power; not involving a confidential relationship." *Head v. Gould Killian CPA Grp., P.A.*, 371 N.C. 2, 9 (2018) (cleaned up). In contrast, a fiduciary relationship is "characterized by 'a heightened

level of trust and the duty of the fiduciary to act in the best interests of the other party.' " *Id.* at 10 (quoting *Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 367 (2014)). Because the transaction between VHS and PRA was an arm's-length transaction and not one where a fiduciary relationship existed, VHS cannot show, and has not alleged, that PRA violated a duty necessary to plead negligent misrepresentation. VHS has not made a sufficient claim for negligent misrepresentation under North Carolina Rule of Civil Procedure 8, and the trial court was correct to dismiss this claim.

Accordingly, I concur with the majority in the result on this issue, namely that the plaintiffs' complaint was insufficient to plead negligent misrepresentation. However, I would hold that negligent misrepresentation is properly pled under North Carolina Rule of Civil Procedure 8 and not Rule 9(b).

## II.   Summary Judgment Claims Related to Triable Issues of Material Fact

### A.  Standard of Review

"This Court reviews decisions arising from trial court orders granting or denying motions for summary judgment using a de novo standard of review." *Cummings v. Carroll*, 379 N.C. 347, 358 (2021). To evaluate "the appropriateness of a trial court's decision to grant or deny a summary judgment motion in a particular case, 'we view the pleadings and all other evidence in the light most favorable to the nonmovant and draw all reasonable inferences in that party's favor.' " *Id.* (quoting *N.C. Farm Bureau Mut. Ins. Co. v. Sadler*, 365 N.C. 178, 182 (2011)).

"The purpose of [summary judgment] is to eliminate formal trials where only

questions of law are involved." *Lowe v. Bradford*, 305 N.C. 366, 369 (1982) (citing *Kessing v. Nat'l Mortg. Corp.*, 278 N.C. 523 (1971)). The summary judgment procedure, "allows the trial court to pierce the pleadings to determine whether any genuine factual controversy exists." *Id.* (cleaned up). Accordingly, Rule 56(c) of the North Carolina Rules of Civil Procedure states that summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." *Id.* (quoting N.C.G.S. § 1A-1, Rule 56(c)). "An issue is genuine if it can be proven by substantial evidence and a fact is material if it would constitute or irrevocably establish any material element of a claim or a defense." *Id.* (cleaned up).

To prevail on summary judgment, the moving party must meet "the burden (1) of proving an essential element of the opposing party's claim is nonexistent, or (2) of showing through discovery that the opposing party cannot produce evidence to support an essential element of his or her claim." *Id.* (first citing *Moore v. Fieldcrest Mills, Inc.*, 296 N.C. 467 (1979); then citing *Zimmerman v. Hogg & Allen*, 286 N.C. 24 (1974)). "If the moving party meets this burden, the non-moving party must in turn either show that a genuine issue of material fact exists for trial or must provide an excuse for not doing so." *Id.* (citing *Econo-Travel Motor Hotel Corp. v. Taylor*, 301 N.C. 200 (1980)). Importantly, "[t]he opposing party need not convince the court that he would prevail on a triable issue of material fact but only that the issue exists." *Id.*

at 370. Issues that are "legitimately called into question" must be preserved for resolution by a jury, and "it is not the function of this Court, or the trial court . . . , to weigh conflicting evidence of record." *Howerton*, 358 N.C. at 471.

## B. Breach of the APA

Under Delaware law, courts interpret contracts as a whole, "will give each provision and term effect, so as not to render any part of the contract mere surplusage," and will not "read a contract to render a provision or term meaningless or illusory." *In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39, 56 (Del. 2019) (cleaned up). "[The] central aim . . . of contract law is to protect and fulfill the reasonable expectations of the parties in forming a contract." Mohsen Manesh, *Express Contract Terms and the Implied Contractual Covenant of Delaware Law*, 38 Del. J. Corp. L. 1, 7 (2013). While "parties [typically] articulate their intent in the express terms of an agreement," courts recognize that "[n]o matter how skilled, sophisticated, or resourceful[ ] [the] parties [are, they] will be unable to anticipate and address every possible situation that may develop after the contract is formed." *Id*. Accordingly, "[m]odern contract law . . . recognize[s] an implied covenant to the effect that each party to a contract will act with good faith towards the other with respect to the subject matter of the contract." *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986). This covenant is breached when it is "clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the

implied covenant of good faith—had they thought to negotiate with respect to that matter." *Id*.

At the same time, the covenant of good faith and fair dealing "is not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, . . . later adversely affected one party to a contract. Rather the covenant is a limited and extraordinary legal remedy." *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010). The covenant should not be applied "to give plaintiffs contractual protections that they failed to secure for themselves at the bargaining table." *Winshall v. Viacom Int'l, Inc.*, 55 A.3d 629, 636–37 (Del. Ch. 2011) (cleaned up). Accordingly, a court should not use the implied covenant to "rewrite a contract" that a party "now believes to have been a bad deal." *Nemec*, 991 A.2d at 1126. Delaware courts have cautioned that the implied covenant is applied "rarely, and only in narrow circumstances." *NAMA Holdings, LLC v. Related WMC LLC*, No. 7934-VCL, 2014 WL 6436647, at \*17 (Del. Ch. Nov. 17, 2014) (unpublished) (quoting *Allied Cap. Corp. v. GC-Sun Holdings, L.P.,* 910 A.2d 1020, 1032 (Del. Ch. 2006)).

The implied covenant of good faith and fair dealing "inheres in every contract," *Chamison v. HealthTrust, Inc.-Hosp. Co.*, 735 A.2d 912, 920 (Del. Ch. 1999), and is "best understood as a way of implying terms in the agreement, whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions[,]" *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) (cleaned up). Moreover, if the terms of the contract provide a party with discretion in determining

whether a condition is met, the implied covenant requires that the party use good faith in making that determination. *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055 (Del. Ch. 1984), *aff'd*, 575 A.2d 1131 (Del. 1990). The term "good faith" "exclude[s] a wide range of heterogenous forms of bad faith" and stated most simply, requires "a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Dunlap*, 878 A.2d at 441–42 (cleaned up). Indeed, "[a] party may breach the implied covenant of good faith and fair dealing without violating an express term of the contract." *PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.*, 857 A.2d 998, 1016 (Del. Ch. 2004) (citing *Chamison*, 735 A.2d at 920).

### 1. Breach of APA sections 2.6(a)(i) and (ii)

In this case, sections 2.6(a)(i) and (ii) of the APA required PRA to "reasonably determine" completion of the first and second software development earnout milestones. The use of the phrase "reasonably determine" grants PRA discretion, and this discretion must be exercised in good faith. *See Gilbert*, 490 A.2d at 1055. However, VHS contends that instead of exercising this discretion in good faith, PRA's determination regarding completion of the first and second development milestones was "unreasonable, arbitrary, and made in bad faith." Accordingly, VHS asserts that there is substantial evidence in the record showing that PRA violated the implied covenant of good faith and fair dealing.

More specifically, VHS argues that the APA development milestones "were in

a constant state of flux." Indeed, VHS claims that the required functional updates were a moving target and that PRA never reasonably evaluated completion of those milestones. The evidence VHS presented shows that during the negotiation period, Mike Irene (PRA's Executive Director of IT) compiled a list of "functional gaps" to assess whether VHS's software was worth pursuing. This assessment was incorporated into the APA as milestones that needed to be met to trigger additional payments from PRA to VHS. However, in the case of the first milestone, which was the integration of Salesforce modules, PRA made changes to the agreed upon list of required modules. Specifically, PRA determined that some of the modules included in the APA no longer "made sense" and decided not to integrate them. After making this determination, PRA not only removed those modules from the list but also mandated the integration of additional modules which were not included in the APA.

In regard to the second milestone, which was the completion of key product enhancements, PRA determined that certain functional requirements "did not make the cut" or "were no[ ] [longer] required." Furthermore, the evidence presented supports that other functional requirements under the second milestone were changed based on incorrect information that PRA had about its existing Siebel System.

Determining whether PRA breached sections 2.6(a)(i) and (ii) of the APA requires this Court to look beyond whether the first and second milestones were completed. Instead, this Court must determine which party is responsible for these

milestones not being met. Under the APA, PRA had an express and implied obligation to make a reasonable determination about the completion of the first two software development milestones and to exercise this discretion in good faith. However, changing the requirements necessary to meet the first two milestones does not meet the definition of what it means to "reasonably determine" in good faith. Instead, it shows changes that were not originally agreed on by both parties in the APA. Based on the evidence presented above and viewed in the light most favorable to VHS, *see Cummings*, 379 N.C. at 358, summary judgment is not appropriate. Moreover, it is not this Court's role to weigh the evidence, *Howerton*, 358 N.C. at 471, and VHS is not required to "convince [this Court] that [it] would prevail on an issue of material fact[,]" but instead all that is required is for VHS to show that an issue of material fact exists, *Lowe*, 305 N.C. at 370. VHS has met this threshold. Accordingly, I would hold that the covenant of good faith and fair dealing applies to this case, and the trial court erred in granting defendants' Motion for Summary Judgment.

### 2. Breach of Contract Associated with the External Sales Provision

I agree with the majority that the trial court erred in granting summary judgment in favor of the defendants as it relates to plaintiffs' claim that PRA breached the External Sales provision of the APA. But in addition to concluding that a jury could find that the Takeda Deal constituted an External Sale, I would also hold that a jury could find PRA violated the implied covenant of good faith and fair dealing in its post-closing conduct as it pertains to the External Sales provision.

VHS contends that PRA violated the implied covenant of good faith and fair dealing associated with the APA's External Sales provisions, sections 2.6(a)(iv) through (vii) of the APA. The External Sales provision is a milestone that requires PRA to make earnout payments "upon the achievement of aggregate External Sales." Under Delaware law, courts first consider the express earnout covenants or clauses which may impact the buyer's post-closing obligations or efforts regarding earnout payments. *See Chamison*, 735 A.2d at 920. In the absence of such provisions, the implied covenant of good faith and fair dealing will be used to "protect the spirit of an agreement when, without violating an express term of the agreement, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain." *Id.*

Because the purpose of applying the covenant of good faith and fair dealing is to "protect the parties' reasonable expectations" under the contract, *Dunlap*, 878 A.2d at 447 (cleaned up), the parties cannot act "arbitrarily or unreasonably thereby frustrating the fruits of the bargain that the asserting party reasonably expected" at the time the contract was executed, *Nemec*, 991 A.2d at 1126. Furthermore, the implied covenant of good faith and fair dealing "requires the finder of fact to extrapolate the spirit of the agreement from its express terms and based on that spirit, determine the terms the parties would have bargained for to govern the dispute had they foreseen the circumstances under which their dispute arose." *O'Tool v. Genmar Holdings, Inc.*, 387 F.3d 1188, 1195 (10th Cir. 2004) (cleaned up) (applying

Delaware law).

In the case at bar, the APA does not include any post-closing covenants or express provisions that reserve or limit PRA's post-closing obligations under the implied covenant of good faith and fair dealing. However, in the court below, PRA argued that the implied covenant of good faith and fair dealing could not be applied to give VHS contractual protections that "they failed to secure for themselves at the bargaining table[,]" quoting *Winshall v. Viacom International, Inc.*, 76 A.3d 808, 816 (Del. 2013) (citation omitted). To support its contention, PRA cited *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 147 (Del. Ch. 2009), and argued that here, as in that case, VHS "could have insisted on specific contractual commitments from PRA" such as the level of resources PRA needed to devote to developing CTMax or a "guarantee that Parthasarathy would have 'full authority' over the [software] development, or a plan for making external sales."

Agreeing with PRA, the trial court cited *Airborne Health,* 984 A.2d at 147, and found in PRA's favor. However, the Business Court's reliance on *Airborne Health* was misguided because that case involved express post-closing obligations. There, the seller had bargained for an express "contractual downside protection" that required the buyer to return assets to the seller if the buyer failed to spend certain threshold amounts to market the seller's products. *Id.* Taking this together with a general efforts clause that did not obligate the seller to spend any certain amount of money, the Delaware Court of Chancery concluded that the implied covenant of good faith

and fair dealing did not apply. *Id.* Essentially, because the parties had bargained for post-closing obligations and included express terms to that effect in their contract, there were no gaps for the implied covenant of good faith and fair dealing to fill. *See id.*

No such provision exists in the APA in this case, accordingly the implied covenant of good faith and fair dealing is appropriate to fill in this gap. While it is true that the implied covenant should not be applied to create obligations for PRA that do not exist in the APA, *see Winshall*, 76 A.3d at 816, this does not detract from PRA's obligation to carry out the terms of the contract in good faith and ensure that the parties' reasonable expectations are honored, *see Dunlap*, 878 A.2d at 447. VHS argues there are three questions of fact for the jury: (1) the meaning of the term "External Sales"; (2) PRA's post-closing obligations under the implied covenant of good faith and fair dealing; and (3) whether PRA used oppressive or underhanded tactics to thwart VHS's reasonable expectations under the APA.

On VHS's first point, the text of the APA is unambiguous. The APA defines an "External Sale" as "the sale of one or more licenses to the Solutions . . . to a third party which is not (i) an Affiliate of Purchaser or (ii) using such license(s) in connection with providing services to Purchaser and/or any of its Affiliates." Merriam-Webster's dictionary defines the term "sale" as "the act of selling," which refers to "the transfer of ownership of and title to property from one person to another for a price." *Sale*, Merriam-Webster.com Dictionary, Merriam-Webster

https://www.merriam-webster.com/dictionary/sale (last visited May 30, 2023). While the trial court determined that the term "External Sale" is limited to a standalone sale of the license, this interpretation is inconsistent with the APA's text. By using the term "sale," the APA intended to keep the meaning of "External Sale" broad. If PRA is transferring title by allowing a third party to use the software, that transaction would qualify as an External Sale. This means that by the APA's terms, an External Sale could also include "software as a service" or the right to use VHS's software in conjunction with receiving clinical trial services from PRA. Accordingly, if PRA failed to credit a "software as a service" transaction as an External Sale, then this would be an express breach of the APA.

Second, VHS asserts that a jury must determine whether PRA's post-closing conduct breached the implied covenant of good faith and fair dealing. VHS asserts that four of PRA's actions constituted a breach of this covenant: (1) PRA's sequencing of the milestones, which according to VHS were supposed to be concurrently running; (2) PRA's decision to unmanage the package, which eliminated Salesforce licensing; (3) PRA's diversion of resources away from the APA milestones; and (4) PRA's rejection of specific External Sales opportunities.

The evidence VHS presented shows that as soon as Parthasarathy began working for PRA, he started working on both sets of earnout milestones by circulating plans to complete the milestones and requesting the necessary resources. Parthasarathy took these actions "because in [his] mind[ the] clock [was] ticking" on

all the milestones and addressing both milestone groups simultaneously was the best strategy to ensure the milestones were completed. However, Colin Shannon (PRA's Chief Executive Officer) expressed to Parthasarathy that the immediate focus would be on the internal software development rather than External Sales, and only once the internal software development was completed would External Sales become a priority.

Accordingly, Parthasarathy began working on the internal software Development Milestones listed in the APA. However, PRA did not adhere to the milestone requirements listed in the APA. In fact, Chuck Piccirillo (PRA's Senior Vice President of IT) testified that he did not remember reviewing the APA after it was signed, and the transaction had closed. Moreover, at one point the person who had authored the requirements for these milestones, Irene, was no longer involved in this work, and while that person assumed Piccirillo was tracking the requirements for the Development Milestones, it is unclear if this was occurring.

There is also evidence that no development plan was instituted and there were no resource approvals for completion of the milestones for nearly eighteen months after the APA was signed. Namely, Irene testified that although he had "influence on the execution of the [software] plan and the timeline for it[,]" he was not involved in that work until almost eighteen months later. Indeed, Irene explained that eventually the work he did "right[ed] the ship" and was "part of the solution." Moreover, the requirements associated with PRA's internal software development

were in flux. For example, regarding the first Development Milestone, the integration of Salesforce modules, PRA determined that some of the required modules no longer "made sense" to integrate. After making this determination, PRA removed those modules from the list and mandated the integration of a different and expanded list of Salesforce modules which were not included in the APA.

Similarly, there is evidence that for the second Development Milestone, key product enhancements, PRA determined that certain functional requirements "did not make the cut" or "were no[ ] [longer] required." In addition, other functional requirements under the second milestone were changed due to incorrect information PRA had about its existing Siebel System. There is also evidence that while PRA knew it would have to "develop [certain functional requirements] from scratch[,]" it never assigned the resources to realize this project.

Additionally, VHS provided evidence showing that VHS's software was originally a "managed package," which means that the application satisfied Salesforce's requirements for licensing through AppExchange. In October 2016, PRA decided to "unmanage the package" of VHS's software in order to customize the software "to [PRA's] own needs." The process to unmanage the code was lengthy and took approximately one to two months of work. Furthermore, by unmanaging the package, PRA eliminated the possibility of licensing the software on AppExchange and with it any standalone External Sales.

Moreover, there is evidence that in March 2017, a customer named Vertex

approached PRA seeking a licensable "managed package" version of the software. Because PRA had unmanaged the package, it could not offer Vertex what it sought. While Vertex ultimately used another software vendor, PRA still gained Vertex as a customer for providing clinical trial management services. There is also evidence that although Parthasarathy was initially involved in discussions regarding Vertex, he was removed from the email chain because Deborah Jones-Hertzog (PRA's Senior Vice President of IT) "did[n't] want [Parthasarathy] to read" the email she was sending. This email included Jones-Hertzog stating that if they sold the software "it would be the 1st time . . . [Parthasarathy's] product" would be sold and that accordingly, Parthasarathy would be entitled to receive royalties under the APA. Indeed, Jones-Hertzog explained in her email that she and Shannon were discussing "different models" under which Parthasarathy could sell the software that "need[ed] to [be] factor[ed] . . . into the conversation."

There is also evidence that in August 2016, PRA finalized its Master Services Agreement (MSA) with Takeda. Under the MSA, PRA agreed to provide clinical trial management services to Takeda using VHS's software. In doing so, PRA licensed its "owned technology," also known as VHS's software, to Takeda to support PRA's providing Takeda with clinical trial management services. During the time PRA provided Takeda with services, PRA earned nearly half a billion dollars in revenue from Takeda. At the same time, PRA has not credited the Takeda transaction toward the External Sales Milestones.

Third, VHS asserts that a jury must decide whether PRA's post-closing conduct thwarted VHS's reasonable expectations to realize the External Sales Milestones in violation of the implied covenant of good faith and fair dealing. As outlined above, the evidence presented by VHS provides support for VHS's version of events. Under the relevant caselaw, the implied covenant of good faith and fair dealing must be used to fill in the gap in the APA and determine whether PRA acted arbitrarily or unreasonably thereby frustrating the parties' reasonable expectations at the time the APA was signed. *Nemec*, 991 A.2d 1120.

If a jury believes the evidence presented by VHS, it could find that PRA sequenced the milestones and did not allow work on the second and third milestones to begin until work on the first milestone was completed. A jury could also find the same is true for the External Sales Milestone and that PRA did not allow work on External Sales to begin until after work on the first three Development Milestones was completed. Next, a reasonable jury could find that by unmanaging the package, PRA diverted resources away from the APA milestones and eliminated the opportunity of licensing the software on AppExchange, thereby thwarting Parthasarathy's efforts to meet the External Sales provision. Indeed, the emails sent by Jones-Hertzog could also lead a jury to believe that PRA's interference in the Vertex deal was intentional. Lastly, under the terms of the APA, a jury could also find that the Takeda Deal meets the definition of an External Sale and that PRA's failure to credit it as such is an express breach of the APA.

Thus, taking the evidence presented in the light most favorable to VHS and drawing all reasonable inferences in VHS's favor, *see Cummings*, 379 N.C. at 358, I would hold that summary judgment is not appropriate, and that the case should be remanded to the trial court so that a jury can decide whether PRA breached the External Sales provision of the APA, and whether PRA violated the implied covenant of good faith and fair dealing through its post-closing conduct.

### III. Conclusion

In sum, I depart from the majority opinion on three issues. First, whether Rule 8 or Rule 9(b) of the North Carolina Rules of Civil Procedure applies to pleading a claim for negligent misrepresentation. Second, whether under Delaware law the implied covenant of good faith and fair dealing applies to plaintiffs' breach of contract claims under sections 2.6(a)(i) and (ii) of the APA. Third, whether the implied covenant of good faith and fair dealing applies to PRA's post-closing conduct. Therefore, on those issues I would hold that (1) negligent misrepresentation is properly pled under Rule 8; (2) the implied covenant of good faith and fair dealing applies to VHS's breach of contract claims under sections 2.6(a)(i) and (ii) of the APA and accordingly summary judgment is not appropriate; and (3) the implied covenant of good faith and fair dealing applies to PRA's post-closing conduct and thus summary judgment is not warranted.

Justice MORGAN joins in this concurring in part and dissenting in part opinion.